[No. C062388. Third Dist. June 9, 2010.]

In re the Marriage of JILL and VICTOR D.
JILL D., Respondent, v.
VICTOR D., Appellant.

In re L.D. et al., Minors.
JILL D., Petitioner and Respondent, v.
VICTOR D., Objector and Appellant.

492

---

COUNSEL

Leslie A. Barry, under appointment by the Court of Appeal, for Appellant and for Objector and Appellant.

Frank E. Dougherty for Respondent and for Petitioner and Respondent.

No appearance for Minors.

---

OPINION

**SCOTLAND, P. J.**—Victor D. (father), the biological father of three children (the minors), appeals from orders (the judgment) terminating his parental rights so the minors could be adopted by their stepfather. (Fam. Code, § 7820.) Father contends the judgment must be reversed because, in his view, the evidence was insufficient to establish that he left the minors for a period of one year and intended to abandon them during that period. (Fam. Code, § 7822.) We shall affirm the judgment.

As we will explain, the trial court properly held that the circumstance by which the minors' mother initially assumed sole physical custody of them was irrelevant to the determination whether father left the minors within the meaning of the statutory scheme. Indeed, it was not alleged that father left the minors at that time. The relevant factual context was the point at which it was claimed that, by his actions and inactions, father left and abandoned the minors. We also reject father's claim that there was insufficient evidence to support the trial court's finding that he left the minors for one year with the intent to abandon them during that time.

FACTUAL AND PROCEDURAL HISTORY

Father and the minors' mother were married in 1991. Their three children were born in 1996, 1997, and 1999, respectively. Father and mother separated in February 2000, with mother leaving the family home and taking the minors with her.

In March 2000, mother filed for legal separation, alleging that she left to escape father's "increasing instability and violence" and lived in domestic violence shelters.

The Yolo County Superior Court issued a temporary restraining order against father, directed that he have no visitations with the minors, and ordered the parties to attend mediation, with Shaaron Garey as the mediator. The parties agreed that, if Garey found it appropriate, father could have supervised visitation beginning in April 2000, and telephone contact with the children twice a week. Father agreed to drug testing and weekly individual counseling. In June 2000, the parties entered into a stipulation which provided, among other things, that visits would be supervised by mother's parents, and that father could contact them for the sole purpose of discussing issues related to the minors.

The family law matter came on for hearing on July 20, 2000. Father failed to appear. Garey expressed concern about father's "out of control behavior" and told the trial court the marriage therapist believed father's behavior was "cause for great concern because of the verbal abuse." Garey also felt mother's safety was at risk. At the July 20 hearing, the court suspended visitation pending further order of the court, and directed father to pay child support. The court also issued a permanent restraining order, protecting mother and her parents, and awarded legal and physical custody of the minors to mother, with no visitation for father.

On August 23, 2000, mother filed in the Yolo County Superior Court a petition for dissolution of marriage. The next day, father sought to set aside

the restraining order, to reinstate mediation regarding custody of the minors and visitation, and to modify the child support order. Father's motions were denied, with the court stating it would not modify the visitation orders until receiving a written report from Garey.

Despite the restraining orders and the no visitation order, the parties agreed to father having monitored visits with the minors from May 2000 to February 2001. Initially, these visits were supervised by a professional organization, then by mother's parents, and then by mother's brother. Father's last visit and contact with the minors was in February 2001.

In June 2001, Garey filed a written report with the court. She noted there were ongoing areas of conflict and serious concern related to father's behavior, possible drug use, and alleged domestic violence. She also described some of father's attempts in May 2000 to contact mother "by leaving messages in his car window in front of [Garey's] office, as [mother] was meeting individually with [Garey] . . . . Further, [father] attempted to pass written messages through [Garey] stating that they were cards for the children."

Garey reported the maternal grandparents had facilitated and cooperated with supervising visits. Father "had a difficult time containing himself emotionally during these visits. His behavior was described as emotional and as obsessing with wanting to discuss [mother] and divorce matters with the grandparents." Later, mother's brother supervised visits. Those visits "also went poorly, with [father] behaving emotionally and erratically, and not focusing on the children. Again there was the issue of [father] wanting to engage in discussion regarding [mother] and the divorce issues." Garey reported that in February 2001, after a period in which the minors had no contact with father, a schedule was arranged for supervised visits and phone contact between father and the minors. However, he did not call the children as agreed, and he did not respond to the visitation schedule.

Garey recommended that, prior to continued contact with the minors, father should participate in a psychological evaluation, random drug testing, additional individual therapy, and anger management. She based these recommendations on the "original domestic violence allegations, the violations of the [restraining order], the ongoing difficulty with following both agreements and recommendations, and the serious concern regarding the emotional stability of [father] and the effect this may have on both his future and current ability to parent these young children."

In July 2001, the trial court followed Garey's recommendation and ordered father to participate in a psychological evaluation and testing prior to

continued contact with the minors. The court also ordered father to participate in anger management and individual therapy, and to keep the court, the mediator, and mother's counsel advised of father's current address and telephone numbers. Jurisdiction on other issues was reserved.

Father moved to Florida in August 2001. He did not appear at the August 2001 hearing on the reserved issues of child support, custody, and visitation.

On September 14, 2001, the Yolo County Superior Court entered judgment on the reserved issues, confirming the earlier visitation orders and awarding mother sole legal and physical custody of the children. Father was ordered to participate in a psychological evaluation, including psychological testing with a psychologist appointed pursuant to Evidence Code section 730, and to have no contact with the minors pending completion of that evaluation. He was also ordered to keep the court, the mediator, and mother's attorney informed of father's current address and telephone number, to participate in random drug testing, to participate in anger management and individual counseling, and to pay child support.

It was reported that, on multiple occasions, father violated the restraining order, starting as early as May 2000. Some of the violations resulted in criminal convictions. In November 2001, father began repeatedly calling mother and her parents, frequently leaving angry and threatening phone messages which included demands about seeing the minors. In June 2002, he began sending e-mails to mother, matching the tone and subject of his phone messages.

In July 2003, pursuant to mother's request, the restraining order was renewed. The order, which continued to protect mother and her parents, was extended until the youngest minor became 18. The minors were not protected under the restraining order.

In October 2004, father filed a motion to modify visitation and child support. At the hearing, the court reiterated that father was required to undergo psychological evaluation before he could have contact with the minors and that he was ordered to submit to drug testing. The court also ordered father to contact Garey so she could review his progress and make recommendations. Ultimately, on June 13, 2005, the court denied father's request to modify the existing visitation and support orders.

On January 24, 2006, father filed another motion, seeking modification of the custody, visitation, and support orders. On March 23, 2006, the motion was denied. At the hearing, father claimed that he had completed the requirements to see the minors. The court ordered him to provide documentation of such compliance before filing further modification requests. The court also noted mother's intention to file for termination of father's parental rights.

On May 1, 2006, mother and her current husband filed *in the Sacramento County Superior Court* a petition to terminate father's parental rights and a request for adoption of the minors by their stepfather.

On May 23, 2006, father filed in the Yolo County Superior Court his third motion, seeking modification of orders regarding visitation and custody of the minors. The court again denied the motion and ordered that father not file further such motions until he had completed the previously ordered psychiatric evaluation, anger management classes, individual counseling, and he had proof of random drug testing. The court also warned father that it would order him to pay mother's attorney fees if he filed another motion without having completed the ordered services.

The trial on the petition to terminate father's parental rights took place in the Sacramento County Superior Court on November 2, 2006. The court terminated said rights on the ground of abandonment. (Fam. Code, § 7822.) Father appealed, and this court reversed on jurisdictional grounds. (*Adoption of L.D.* (Oct. 26, 2007, C054705) [nonpub. opn.].)

In February 2008, mother filed in Yolo County Superior Court a petition to terminate father's parental rights, alleging that he had abandoned the minors, within the meaning of Family Code section 7822, in that he had not visited them since March 2001 and had "economically and emotionally abandoned his children."

In his opposition to the petition, father claimed he did not leave the minors and did not intend to abandon his children. He also filed a motion, once again seeking modification of the 2001 visitation order. Claiming he had fulfilled the requirements of the prior court order, father attached a copy of a psychological report dated September 25, 2006; a form indicating he had completed a 10-session anger management program on August 23, 2006; a bill apparently for individual therapy sessions in May and June of 2000; a letter of March 8, 2005, indicating he had not shown up for his scheduled appointment at Parental Stress Services; some evidence of drug testing in 2000; and a letter certifying he had enrolled in a chemical dependency program in February 2004.

Counsel was appointed for the minors, and the court referred the matter to the probation department for an evaluation and report.

A trial on the petition to terminate father's parental rights was held in November 2008 and March 2009.

Father testified he visited the minors as consistently as he could, but acknowledged that he last visited them in February 2001. He claimed he did

not visit or contact his children because mother's family "thwarted" him; the restraining order prevented him from contacting mother and her parents; and mother's brother, who had supervised visits, refused to talk to father and changed his phone number so father could not contact him. Father acknowledged that he was aware the restraining order did not prohibit him from contacting the minors. He also knew that he had to meet certain conditions in order to contact and visit the minors, including a psychological evaluation and anger management classes. Father did not take anger management classes until August 2006, and he did not get a psychological evaluation until September 2006.

Mother's brother disputed father's claims, and testified as follows: Initially, he had a good relationship with father and facilitated father's visits with the minors from December 2000 through February 2001. Father was inconsistent in his involvement with the minors during those visits and sometimes was late to, or failed to complete, scheduled visits. During and after one December 2000 visit, father was primarily focused on talking with him about how to get back together with mother. In February 2001, he sent father a proposed visitation schedule and spoke with him on the telephone about the schedule. Father promised to call back, but failed to follow up. Mother's brother then left messages for father, who did not return the calls or otherwise seek to schedule visitation. Father was never blocked from calling and was never prevented from scheduling visits. Father never contacted him after February 2001, and mother's brother did not change his phone number until about 2003.

Garey testified as follows: Father's behavior in 2000 and 2001 led to (1) concerns for the safety of mother and the minors and (2) worries that father was using drugs. Mother had been cooperative in setting up visits between father and the minors, but father was inconsistent in his visitation. He contacted Garey in April 2001 to try to arrange a visit; however, when she tried to arrange the visit, he could not be found. In 2004, father contacted Garey again wanting to arrange additional visitation; but he had not satisfied the conditions imposed by the court.

Evidence showed that, at the time of trial, father owed $336,648.02 in back child support and had made no child support payments in 2001. In December 2002, his wages were garnished in the sum of $1,343.56 for child support. Between January 2003 and September 2003, he paid $14,601 in child support, also as a result of a wage garnishment. In March 2004, he paid $805.06 in child support through a levy on his bank account. In 2005, 2006, and 2007, he made no child support payments. In September 2008, he made a single payment of $75. He made no child support payments between March 2004 and September 2008.

The Department of Child Support Services in Yolo County (DCSS) made various collection efforts against father, including wage garnishments, recorded liens, and suspension of his driver's license. Father spoke with DCSS employees approximately 10 times between December 2003 and April 2004, telling them he thought the support order was "absurd." In 2003, DCSS advised father on how to seek modification of the custody and support orders, including utilizing a court facilitator. He did not pursue this course of action because he "didn't trust the system." He was uncooperative with DCSS and did not inform them of his earnings in 2003. He told DCSS in January 2004 that he had no intention of paying child support if he could not see his children.

At trial, father claimed he did not pay child support because he was "broke." Between 2001 and 2003, his tax returns reflected income of over $77,000. According to him, friends and family lent him approximately $73,000 from 2001 through 2003, a period during which he lived in Florida with his aunt, who did not charge him rent and paid all of his expenses during that time. Father denied making any significant income from his business selling welding equipment. However, he had held himself out as the owner of the business, which advertised $2.2 million in annual sales and had a well-stocked warehouse of equipment. He conducted his business on a cash basis, with no records kept and no tax returns filed since 2004.

Father's girlfriend, Michelle Coberly, testified that she was unaware of him seeking employment since 2006. She had lent him approximately $50,000 to pay for things such as living expenses, business expenses, and attorney fees. She was an investor in his company, "Vic D[] and Associates," and had purchased equipment for his business using her credit card. He turned over sales receipts to her, but she kept no records and had no accounting system for the sale of welding equipment. She did, however, purchase $50,000 in equipment for the business.

Friends of father testified that he loved the minors and had a good relationship with them.

Friends of mother testified that the minors were happy with her and her husband, whom they treated as their father. The only time the minors mentioned father was when one of the children said he did not want to know father.

Following trial, the minors' counsel urged the termination of father's parental rights based on (1) his abandonment of the minors and (2) their best interests. The probation report recommended the court terminate parental rights.

The court found that father had abandoned the minors within the meaning of Family Code section 7822 and that termination of his parental rights was in the minors' best interests. Specifically, the court found that father left the minors in mother's custody and care in early 2001, for over a period of one year without any provision for support or communication from him; that father had intended to abandon the minors, as shown by his failure to support and communicate with them; and that father had not rebutted the statutory presumption of Family Code section 7822. Pointing out that father did not provide support for almost 23 months, the court found that father's evidence about his financial condition was not credible, and that father had pursued work "under the table to avoid paying taxes and child support since 2003." As to father's failure to communicate with the minors, the court noted "pounding your chest and saying you want to see your children is not the same as taking steps to do it. . . . [M]any of the steps that [father] took were more about the anger of his wife th[a]n they were about an intent to see his children." The court observed that, until 2006, father never took steps necessary to meet the court-ordered requirements to visit the minors. Finding it would be in the best interests of the minors to terminate father's parental rights, the court did so. Because father does not challenge the finding that said action was in the best interests of the minors, we need not recount the facts that amply support the finding.

## DISCUSSION

### I

We find no merit in father's contention that the trial court "erred when it determined that the circumstances surrounding how the children initially came to be in [mother's] sole legal and physical custody were irrelevant to the issue of whether or not Father left the children."

█ The Family Code permits a court to declare a child under the age of 18 years to be free from the custody and control of a parent when the parent has abandoned the child. (Fam. Code, §§ 7820, 7822; further section references are to the Family Code.) Abandonment occurs when a "parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, *or* without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3), italics added.) (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1009–1010 [79 Cal.Rptr.3d 743] (hereafter *Allison C.*); *In re Amy A.* (2005) 132 Cal.App.4th 63, 68 [33 Cal.Rptr.3d 298] (hereafter *Amy A.*); *In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 754 [7 Cal.Rptr.3d 768] (hereafter *Jacklyn F.*).)

Thus, the question presented by the statutory scheme is whether, and if so when, a parent "left" his or her child in the care and custody of another person with the intent to abandon the child.

Father posits that the trial court "misapplied the law" by "limiting its [abandonment] analysis to the time period beginning in February 2001," when father ceased making efforts to contact the minors. In father's view, the "circumstances under which the children came to be in [mother's] sole legal and physical custody should have been the beginning point of the analysis."

■ To support his position, father relies on *Allison C., supra,* 164 Cal.App.4th 1004, *Amy A., supra,* 132 Cal.App.4th 63, *Jacklyn F., supra,* 114 Cal.App.4th 747, *In re George G.* (1977) 68 Cal.App.3d 146 [137 Cal.Rptr. 201], and *In re Cattalini* (1946) 72 Cal.App.2d 662 [165 P.2d 250]. He claims those cases have consistently "started the analysis of the leaving requirement at the point that the petitioning party obtained custody of the child." That statement is true, as far as it goes. But those cases started the analysis at the point when the petitioning party obtained custody of the child, because that was also the point when it was claimed the responding party had "left" the child. In other words, in those cases, the purported leaving took place at the same time, and involved the same facts, as the initial change in the children's living arrangements or their custodial status. Therefore, those cases did not consider the question of the relevant factual point at which to start the leaving analysis when the date the petitioning party obtains custody is different than the date on which it is claimed the responding party left the child. "An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' [Citations.]" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399].)

■ The relevant factual context for the trial court to examine in determining whether a parent has "left" a child is the point at which there is a claimed voluntary relinquishment of custody and control by the parent. This may or may not be the same point at which the child came into the care and custody of the other parent. In this case, it is not the same.

■ Here, the minors' custodial status changed in 2000, when their mother took them and left the marital home. This was not the point at which father voluntarily relinquished the care and custody of the minors to mother. Nor was there any claim made that father left the minors at this point. There is no dispute that, until February 2001, father maintained some level of contact with the minors, contested various court proceedings, appeared at mediation sessions, and participated in the family court process. There is no allegation that he, by action or inaction, abandoned the minors prior to February 2001.

Rather, the allegation was that, by his inaction, father abandoned the minors *after* February 2001. Thus, the relevant factual circumstances to examine to determine whether he did so began in February 2001.[1]

## II

Father contends the trial court improperly "used [father's] failure to support and communicate with the children after temporary custody orders were issued to satisfy the leaving requirement." To make this argument, he paraphrases the court's decision by stating the "court specifically opined that it did not have to decide whether [father] left the children with [mother] because it found that since February 2001 [father] had failed to support and communicate with the children for periods longer than the statutory period."

The trial court stated: "This is a story, as the evidence has established, of almost Shakespearian proportions. This is the story of a family who was destroyed. What happened happened. I will never know exactly what it was that brought the family under when things first started going sour. There were different perspectives on that. I don't have to decide that today. That's not the question before me. [¶] I absolutely believe you, [father], when you tell me that you love your children. I absolutely believe you when you tell me that your life has been destroyed by this process. Some of the testimony about your financial situation and your view of it is somewhat less credible. And I think you have no insight into your own behavior that contributed to the orders that led to the limitation of seeing your children. But, again, that's not the issue I have to decide today. [¶] I have to decide whether [counsel for mother] has met the requirements of Family Code [section] 7822[, subdivision] (a)(3). [Father's counsel] is quite right in what those three requirement[s] are. But I have to agree with [minors' counsel's] summary of the evidence . . . , and I believe the evidence is clear, compelling, and even overwhelming, that all three criteria are met. That [father] did leave his children in the custody of the other parent. He didn't provide support for almost 23 months, from 2001, until, I think it was December 2002 was the first payment that was garnished. [¶] The failure to communicate, I think, has been established, as [mother's counsel] said, pounding your chest and saying you want to see your children is not the same as taking steps to do it. Now, many of the steps that [father] took were more about the anger of his wife th[a]n they were about an intent to see his children. And I base that on the evidence from [father] in this hearing and the documents and E-mails that

---

[1] Actually, evidence was presented regarding family circumstances in 2000. Father's trial counsel argued extensively that the facts relating to said period of time militated against a finding that father had left the children. In fact, those circumstances are virtually all that father's counsel argued on the issue of whether he had left the children, largely ignoring the evidence of father's behavior and inaction after February 2001.

have been admitted into evidence. [¶] And so finding that the standard has been met under [section] 7822, [subdivision] (a)(3), and finding that the presumption, that there is an intent to abandon under [section] 7822 [subdivision] (b), based on the failure to communicate and support, I hereby terminate the parental rights of [father], and free the children for stepparent adoption."

The issues the trial court said it did not have to decide were (1) what initially caused the family to break up, and (2) father's lack of insight into his own behavior that contributed to the custody and visitation orders. The court was correct in concluding those matters were not relevant to the determination whether to terminate father's parental rights, which turned on two issues noted in the court's written statement of decision: "First, did [father] abandon his children within the meaning of Family Code § 7822? Second, is termination of his parental rights in the best interests of the children?"

The court found all the statutory criteria were met. In order to terminate father's parental rights, the court was required to find father left the minors in the custody of mother, did not communicate with them or provide support for them for over a year, and had the intent to abandon the minors. (§ 7822.) The court expressly made these findings.

As we will explain in part III, *post*, evidence that father did not support and/or communicate with the minors during a period of one year after the court orders granting mother primary custody of the minors was properly considered by the trial court in determining whether mother established "the leaving requirement" of section 7822.

### III

Father argues that, because he was deprived of custody of the minors by judicial decree, not by a voluntary act on his part, there is insufficient evidence to support the trial court's finding that father "left" the minors in mother's care and custody.

We apply the substantial evidence standard of review (*Amy A., supra*, 132 Cal.App.4th at p. 67); in applying this standard, we do not pass on the credibility of witnesses, resolve conflicts in the evidence, or determine the weight of the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 [82 Cal.Rptr.2d 426].) We simply determine whether there is substantial evidence, believed by the trial court, that supports the court's findings. (*In re B. J. B.* (1986) 185 Cal.App.3d 1201, 1211 [230 Cal.Rptr. 332].) There is in this case, as we will explain.

■ In determining the threshold issue of whether a parent has "left" his or her child, the focus of the law is "on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent." (*Amy A., supra*, 132 Cal.App.4th at p. 69, original italics; but see *Jacklyn F., supra*, 114 Cal.App.4th at p. 754 ["the statute contemplates that abandonment is established only when there is a physical act—leaving the child for the prescribed period of time—combined with an intent to abandon, which may be presumed from a lack of communication or support"].)

Thus, this court has held that a parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively "taken" from the parent by court order (*In re Cattalini, supra*, 72 Cal.App.2d at p. 665); however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child (see *id.* at pp. 665–666).

Numerous appellate decisions have long agreed that the leaving-with-intent-to-abandon-the-child requirement of section 7822 can be established by evidence of a parent's voluntary inaction after an order granting primary care and custody to the other parent. (E.g., *Amy A., supra*, 132 Cal.App.4th at p. 70 [parent's "repeated inaction in the face of the custody order provides substantial evidence that he voluntarily surrendered his parental role and thus 'left' [the child] within the meaning of section 7822"]; *In re Jack H.* (1980) 106 Cal.App.3d 257, 264 [165 Cal.Rptr. 646]; *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 815–816 [156 Cal.Rptr. 765] (hereafter *Jacqueline H.*); *In re Conrich* (1963) 221 Cal.App.2d 662, 666–667 [34 Cal.Rptr. 658]; *In re Barton* (1959) 168 Cal.App.2d 584, 588–590 [336 P.2d 210]; *In re Maxwell* (1953) 117 Cal.App.2d 156, 162–165 [255 P.2d 87].)

Simply stated, "nonaction of the parent after a judicial decree removing the child may convert a [judicial] 'taking' into a 'leaving' [of a child by the parent]." (*Jacqueline H., supra*, 94 Cal.App.3d at p. 816; see *In re Conrich, supra*, 221 Cal.App.2d at p. 666 ["that a judicial decree has placed custody of the child away from the parents does not, however, necessarily prevent or destroy the element of 'leaving' because nonaction of the parents may convert into a leaving (and, the other elements present, into an abandonment) that which initially could not be regarded so"].)

In a factual context far different from that in the case now before us, a panel of this court expressed its disagreement with the view that "evidence of a [parent's] failure to communicate [with] or support [the parent's child] for the statutory period of [section 7822] can, in itself, satisfy the separate statutory requirement that the child be 'left' for a prescribed period of time." (*Jacklyn F., supra*, 114 Cal.App.4th at p. 755.) Concluding "the statute contemplates that abandonment is established only when there is a physical

act—leaving the child for the prescribed period of time—combined with an intent to abandon, which may be presumed from a lack of communication or support" (*id.* at p. 754), *Jacklyn F.* found there was no evidence of such leaving in that case. There, a mother left her child with paternal grandparents three days before they filed a guardianship petition, which the mother unsuccessfully contested and then did not have contact with the child for over a year. (*Id.* at pp. 749–750.)

*Jacklyn F.* noted, however, it did "not discount the possibility that, under different circumstances, it might be proper to conclude that a parent has 'left' a child within the meaning of section 7822 despite court intervention," but found that the matter on review was "not such a case." (*Jacklyn F., supra,* 114 Cal.App.4th at p. 756.) That was so because, "[o]nce the guardianship was granted, [the mother] was no longer legally entitled to custody of the minor without further court order" and the mother's "conduct following the granting of the guardianship—which included sending 'stacks' of letters to the minor but failing to visit her—did not constitute 'parental nonaction' amounting to a leaving." (*Ibid.*)

Thus, we do not read *Jacklyn F.* as holding that evidence that a parent has failed to communicate with his or her child for a year or has failed to provide any support for the child during that time can never be circumstantial evidence that the parent left the child and did so with the intent to abandon the child. Otherwise, it would be nearly impossible to prove that a parent who does not communicate with or support his or her child for a year has done what *Jacklyn F.* characterized as the "physical act" of leaving the child for the statutory period.

Here, as of February 2001, father stopped seeking to schedule visits with the minors. He left them in the care and custody of their mother for six months before the final custody and visitation orders were entered. The mediator could not find father after April 2001; indeed, father left California in August 2001 and did not notify the court or the mediator of his new address until October 2004. Father failed to attend the dissolution proceedings or oppose the relief sought by mother on the issues of custody, visitation, and child support. Father made no attempt to appeal the judgment and did not seek modification of the order for over three years. He made no effort to comply with the conditions that would have allowed him to contact the minors.[2] And he did not provide for his children's care in any way, did not seek any type of parental relationship with them, and did not pay child support until it was extracted from him through garnishment of his wages.

---

[2] Father submitted evidence that he complied with drug testing in 2000 and had individual therapy sessions in 2000. As this was before the order specifying conditions necessary to contact the minors, it was not evidence of an effort to comply with the order. In addition, he

This inaction is substantial evidence that father voluntarily surrendered his parental role and left the minors within the meaning of section 7822. (See, e.g., *Amy A., supra*, 132 Cal.App.4th at p. 70; *Jacqueline H., supra*, 94 Cal.App.3d at p. 816.)

## IV

Lastly, father contends there is insufficient evidence that he intended to abandon the minors. He concedes that he failed to provide support for the minors and to maintain communication with them for the statutory period. He also concedes that such failures gave rise to the presumption that he intended to abandon the minors. He contends, however, that he rebutted the statutory presumption. We disagree.

■ "The questions of abandonment and of intent . . . , including the issue of whether the statutory presumption has been overcome satisfactorily, are questions of fact for the resolution of the trial court." (*Adoption of Oukes* (1971) 14 Cal.App.3d 459, 466 [92 Cal.Rptr. 390].) "A parent's 'failure to provide support[] or failure to communicate' with the child for a period of one year or more 'is presumptive evidence of the intent to abandon,' and '[i]f the parent [has] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent . . . .' (§ 7822, subd. (b).)" (*Amy A., supra*, 132 Cal.App.4th at p. 68.)

"When the evidence permits the conclusion of only token efforts to communicate with the child," the " 'findings and order of the trial court under subdivision (a)[(1)] must be sustained,' " unless " 'the presumption of abandonment raised by [token efforts to communicate] has been overcome as a matter of law . . . .' [Citation.]" (*In re B. J. B., supra*, 185 Cal.App.3d at p. 1212.)

Here, the trial court was not required to believe father's testimony regarding his intent and, in light of the other evidence, father's testimony did not overcome the presumption of abandonment. (*In re B. J. B., supra*, 185 Cal.App.3d at p. 1212.) Father need not have intended to abandon the minors permanently; it was sufficient that the evidence supports a finding he intended to abandon them during the statutory period. (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 885 [20 Cal.Rptr.2d 291].)

Father claims the evidence shows he rebutted the statutory presumption because he loved his children and wanted to see them. He also contends he

---

submitted evidence that he signed up for chemical dependency classes in 2004; but there was no evidence he attended such classes or a parenting class in 2005. Evidence of simply signing up for classes, but not attending them, is not evidence of compliance with the court's order that would have allowed father to contact the minors.

took "actions over the years which showed that he did not intend to abandon his children," as shown by his opposition to mother's efforts to deny him custody and visitation. He claims that, although he moved to Florida, he "still tried to communicate with the children through [mother] and his efforts resulted in him being arrested for violation of the restraining order." Father acknowledges he "never made any real concerted effort to comply with the support order." Nevertheless, he argues what is "most important in looking at [his] failure to support is [mother's] feelings about that failure: she did not care if he[] ever paid support if he would voluntarily relinquish his parental rights. Hence, although there was a support order in place, [mother] essentially did not demand payment and [father] showed that he was unable to pay the support . . . ." We are not persuaded.

Although father initially opposed mother's efforts in court regarding custody and visitation, he did not appear at the hearing in August 2001, did not appeal the judgment from that hearing, and made no effort to modify the orders for over three years.

Father's claim that he tried to communicate with the minors through mother rings hollow. Father knew there was a restraining order in place prohibiting him from contacting mother, and he knew that contacting her would not put him in communication with the minors. His leaving telephone messages and e-mails for mother and her parents was consistent with his earlier behavior of utilizing the minors as a cover to speak with mother. Father left signs for mother at the mediator's office and attempted to pass messages to mother through the mediator, claiming that they were cards for the minors. However, when he earlier had supervised visitation with the minors, father obsessed with wanting to discuss mother and the divorce.

When viewed in context, father's behavior supports the court's factual finding that the messages were more about father's anger at mother than genuine attempts to communicate with or see the minors. Father knew what was required to allow him contact with the minors, namely his compliance with the court-ordered conditions. Yet, he made no effort to comply with those orders until 2006, some five years after they were issued.

Equally telling is father's failure to provide support for the minors. He made no support payments for almost two full years after he left the minors. At the time of trial, he was well over $300,000 in arrears in his child support payments. Over the course of seven years, he made a single voluntary child support payment, in the amount of $75. All other child support payments have come through wage garnishments and a bank account levy.

Finding that father's testimony about his finances was not credible, the trial court rejected his claim that he was too "broke" to pay his child support

obligation. Based on the evidence presented, the court reasonably could find that, since 2003, father hid his earnings to avoid paying taxes and child support, which he thought was "absurd" and had " 'no intention of paying if he [could not] see his children.' "

Mother's "feelings" about father's failure to pay child support were irrelevant. Father had numerous conversations with DCSS in which payment demands were made, his wages had been garnished, and his driver's license was suspended due to his failure to meet those demands. In any event, even if mother did not demand such payments, this did not relieve father of his responsibility to provide child support for the minors.

In sum, father did not rebut the presumption that he abandoned the minors.

### DISPOSITION

The judgment is affirmed.

Sims, J., and Robie, J., concurred.