Filed 1/30/14  In re Angelina S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ANGELINA S., a Minor. | |
| PATRICIA G., | F067540 |
| Petitioner and Respondent, | (Super. Ct. No. S-1501-AT-3217) |
| v. | |
| ALEJANDRO S., | **OPINION** |
| Objector and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  James L. Compton, Judge.

Catherine C. Czar, under appointment by the Court of Appeal, for Objector and Appellant.

No appearance for Petitioner and Respondent.

-----

[*]Before Cornell, Acting P.J., Detjen, J., and Hoff, J.[†]

[†]Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

-ooOoo-

Appellant Alejandro S. (father) appeals from the trial court's order terminating his parental rights pursuant to Family Code section 7822.[1]  He contends there was no substantial evidence that he left his daughter Angelina S. with her mother with the intent to abandon her.

We disagree and affirm the court's order.

### FACTS AND PROCEDURAL HISTORY

Father and Patricia G. were married in 2001 and divorced in 2005.  They had one child together, Angelina, who was born in 2003.

According to Patricia, father was abusive toward her, and she did not want Angelina exposed to violence.  In April 2005, the Tulare County Superior Court issued a domestic violence restraining order against father requiring him to stay 50 yards away from Patricia.  On June 15, 2005, Patricia was driving into her garage when father approached her car, broke the driver's side window, and grabbed her.  As a result of this incident, father entered a plea of no contest to corporal injury to a spouse (Pen. Code, § 273.5, subd (a)) and criminal threats (Pen. Code, § 422) and was sentenced to a term of 16 months.  Father was released in about March 2006.

On August 15, 2006, father and Patricia attended family court mediation on visitation and custody issues.  The parties agreed that Patricia would have legal and physical custody of Angelina, and father would have supervised visitation.  On November 28, 2006, the parties agreed that father would have unsupervised visitation every other weekend and that both parents would share legal custody.

On June 15, 2007, father was arrested for alleged abuse of his girlfriend.  Father went to trial, and on August 30, 2007, was convicted of corporal injury to a cohabitant (Pen. Code, § 273.5).  He was sentenced to nine years in prison.

---

[1]Subsequent statutory references are to the Family Code unless otherwise noted.

2.

Patricia married Mario G. in 2011. They have a daughter together. Angelina lives with her mother, stepfather, and half sister. Angelina told a family court services investigator that she would like to be adopted by her stepfather. She also said she did not remember her father and did not want to see him.

On August 27, 2012, Patricia filed a petition to declare Angelina free from the parental custody and control of father under section 7822. She alleged that father had not had any contact with Angelina for over five years and had not paid any child support. Patricia later filed an amended petition seeking termination of father's parental rights pursuant to section 7825.[2]

Father objected to the petition, and a trial on the petition was held on May 24, 2013.

Patricia testified that father had no communication with Angelina since his arrest in 2007. He had not called or sent letters to Angelina. In May 2013, father's brother delivered some gifts and $100 to Patricia's brother for Angelina. Before the recent delivery of gifts and money, Patricia's last contact with father's family was in the summer of 2007. At that time, father's mother, Eva S., called Patricia's cell phone and asked to see Angelina. Patricia dropped Angelina off with Eva, and Angelina was with Eva for about three or four hours. Patricia continued to have the cell phone number Eva had used to call her until around October 2008. No one from father's family called her at that number. Patricia continued to work at the job she had when she was married to father until 2009. Father's family knew where she worked, but no one from his family tried to contact her at her job.

---

[2]Under section 7825, subdivision (a), a child may be declared free from the custody and control of a parent who has been convicted of a crime, where the crime is "of such a nature so as to prove the unfitness of the parent or parents to have the future custody and control of the child." The petition brought under section 7825 was denied and is not at issue on appeal.

After he was arrested in June 2005 for violating the restraining order, father did not have contact with Angelina until August 2006. Then, he had visitation with Angelina on the weekends. Patricia never denied father or any of his family contact with Angelina. Father knew the address of the house where Patricia grew up (the family home) because he sent letters to Patricia in 2000 addressed to the family home. Patricia's brother still lives in the family home, and that is where father's gifts to Angelina were delivered.

Patricia's sister testified that she lived in the family home from 2007 to 2012, and she was not aware of any of father's relatives coming to the house to ask about Angelina. She did see Eva at the end of 2012 at a bus stop. Eva asked her if Angelina was big and how she was doing, but she did not ask to see Angelina. Eva did not say she had any cards, letters, or drawings to give to Angelina.

Father testified that he had no contact with Angelina since his arrest in June 2007. He was still serving his prison term at the time of the hearing and expected to be released in September 2014. Asked if he had sent any letters or cards to Angelina, he said that he had a Bible with a journal and he wrote letters to his daughter constantly in the journal. He was going to send it home or give it to her himself. He had some letters, too, but they were all lost when he was transported from prison to court. He made a jewelry box out of wood and sent it to his mother to give to Angelina. He also made her plaques that say "Angie's Room." Father sent those items sometime in 2012. He testified that he also sent a few letters to his mother to give to Angelina in 2010. He said that was the first chance he had to send things home to his daughter. He also wanted his mother to give Angelina money for Christmas.

Later, father testified that he wrote letters to his daughter which he sent to his mother at least once a month from 2007 until 2010. He did not ask his relatives to bring any of the letters to court because "it slipped [his] mind." At one time, father knew Patricia's brother's address, but he forgot it. He testified that, when he had visitation

with Angelina, they loved spending time with each other and had a strong bond. He testified he did not intend to abandon her.

Father's mother Eva also testified. She recalled father asking her to give Patricia money once or twice. Eva did not give any money because Patricia's siblings did not want to give her any information about Patricia. Father gave Eva gifts to give Angelina. He sent her a jewelry box and two plaques some time in 2012 or 2013. These were the only gifts he sent her. Eva delivered the gifts in May 2013. She took them to Patricia's brother's house. Eva testified that she did not know Patricia's phone number. She did not know where Patricia worked. At first, Eva could not recall whether she had telephone conversations with father after 2007. Eva was in Mexico from 2008 to 2011. Later in her testimony, Eva recalled that she spoke to father by telephone when she was in Mexico and he was in prison. She testified that father asked her to buy Angelina a gift at Christmas from 2009 through 2012.

In her closing statement, Patricia's attorney argued that father had not done enough to try to keep in contact with Angelina. There were many ways he could have gotten Patricia's brother's address to mail Angelina letters. His family knew the address because they delivered a few gifts that month. She argued, "It's more than a dollar short and more than a day late that two weeks before this hearing for an abandonment to finally bring some gifts and a hundred dollar[s] … for the child …." Further, it was not believable that father had written so many letters to Angelina, but he had none to offer the court.

Counsel for Angelina pointed out that the father and Eva presented inconsistent testimony. Father said he was sending letters to his mother to give to Angelina, but Eva was in Mexico during most of that time. Angelina's attorney asserted it would be in her best interest to terminate parental rights.

After hearing the testimony and argument, the court issued its decision granting the petition under section 7822. The court stated:

5.

"[A]s to the willful abandonment, I do find there has been a period in well excess of a year where there has not been contact by the father. He did not make the good faith effort to try and maintain contact. And based upon that it was willful. I realize he's in jail. I realize that makes it difficult. I realize that causes problems. If grandmother said, yeah, she was getting the letters, she wasn't getting them, I don't know what happened to those letters. They're not here. She wouldn't deliver them because she wanted to do it in person. [¶] I do find that there has been … a willful abandonment in this matter in excess of a year where the child has been left with the mother."

A judgment declaring Angelina free from the parental custody and control of father was filed on June 20, 2013. Father filed a notice of appeal on June 26, 2013.

## *DISCUSSION*

Section 7822 allows the court to declare a child free from the custody and control of a parent who "has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).)

We apply the substantial evidence standard of review to the trial court's findings made under section 7822. (*Adoption of Allison C*. (2008) 164 Cal.App.4th 1004, 1010 (*Allison C*.).) "Under the substantial evidence standard of review, '"[a]ll conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment."' [Citation.]" (*Id*. at pp. 1010-1011.) The appellant has the burden of showing the trial court's finding or decision is not supported by substantial evidence. (*Id*. at p. 1011.)

"[A] section 7822 proceeding is appropriate where 'three main elements' are met: '(1) the child must have been left with another; (2) without provision for support or without communication from … his parent[] for a period of one year; and (3) all of such acts are subject to the qualification that they must have been done "with the intent on the

part of such parent … to abandon [the child].'" [Citation.]" (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1010.)

In this appeal, father contends substantial evidence did not support the court's findings that (1) father left Angelina with her mother and (2) he did so with the intent to abandon her. Father implicitly concedes that he did not communicate with or support Angelina for more than a year.

"In determining the threshold issue of whether a parent has 'left' his or her child, the focus of the law is 'on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent.' [Citations.]" (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 504 (*Marriage of Jill & Victor D.*).) While "a parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order …, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child [citation]." (*Ibid.*)

Here, father cannot be found to have "left" Angelina with her mother based *solely* on the family court order granting Patricia physical custody of her. Similarly, we do not conclude that father's incarceration by itself establishes that he left Angelina for purposes of section 7822.

On the other hand, "[n]umerous appellate decisions have long agreed that the leaving-with-intent-to-abandon-the-child requirement of section 7822 can be established by evidence of a parent's voluntary inaction after an order granting primary care and custody to the other parent." (*Marriage of Jill & Victor D.*, *supra*, 185 Cal.App.4th at p. 504.) In *Marriage of Jill & Victor D.*, after the mother and father separated, the family court issued a restraining order against the father and awarded custody of the minor children to mother. (*Id*. at p. 494.) The court ordered the father to participate in a psychological evaluation and drug testing prior to having any contact with the children. (*Id*. at pp. 495-496.) The father twice sought to modify the visitation order, and his

requests were denied. (*Id*. at p. 496.) Later, the mother petitioned to terminate father's parental rights under section 7822, and the petition was granted. (*Marriage of Jill & Victor D., supra,* at pp. 497, 500.) On appeal, the father argued that, because he was deprived of custody of the children by judicial decree and not a voluntary act on his part, there was insufficient evidence he left the children with their mother. (*Id*. at p. 503.) The Court of Appeal disagreed, noting, among other things, that the father did not seek modification of the visitation order for over three years and made no effort to comply with the conditions that would have allowed him to have contact with the children. (*Id*. at p. 505.) The court held, "[t]his inaction is substantial evidence that father voluntarily surrendered his parental role and left the minors within the meaning of section 7822." (*Id.* at p. 506.)

Further, "'being incarcerated does not, in and of itself, provide a legal defense to abandonment of children.'" (*Allison C*., *supra*, 164 Cal.App.4th at p. 1012.) In *Allison C*., the father was incarcerated for domestic violence against the mother and, later, for burglary and driving under the influence. (*Id*. at pp. 1007, 1009.) In finding substantial evidence that the father left his child in her mother's care, the Court of Appeal observed that father's "actions underlying his incarcerations for domestic violence, burglary, and driving under the influence were voluntary" and were evidence that the father voluntarily abdicated the parental role. (*Id*. at p. 1012.)

In this case, father's actions leading to his incarceration were voluntary. Father then failed to communicate with Angelina for over five years while he was in prison. He claimed he had no way of getting letters to Angelina, but this claim was suspect in light of the fact that his mother was able to deliver gifts to Angelina's maternal uncle just before the trial in May 2013. Considered together, father's actions and subsequent inaction were substantial evidence that he voluntarily surrendered his parental role and left Angelina with her mother within the meaning of section 7822.

Father cites *In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 755 (*Jacklyn F.*), for the proposition that failure to communicate or support cannot be used to establish that a parent has "left" a child. In *Jacklyn F.*, the mother had left her child with the paternal grandparents for three days when the grandparents sought guardianship, which the mother unsuccessfully contested. (*Id*. at pp. 749-750.) The Third District Court of Appeal reasoned that, once the guardianship was granted, the mother was no longer legally entitled to custody, and the child's custody status became a matter of judicial decree, not abandonment. (*Id*. at p. 756.) The court opined, "[Section 7822] contemplates that abandonment is established only when there is a physical act—leaving the child for the prescribed period of time—combined with an intent to abandon, which may be presumed from a lack of communication or support." (*Id.* at p. 754.) The court concluded that the mother's "conduct following the granting of the guardianship—which included sending 'stacks' of letters to the minor but failing to visit her—did not constitute 'parental nonaction' amounting to a leaving." (*Id*. at p. 756.) The court, however, "[did] not discount the possibility that, under different circumstances, it might be proper to conclude that a parent has 'left' a child within the meaning of section 7822 despite court intervention .…" (*Ibid*.)

Later, in *Marriage of Jill & Victor D*., another panel of the Third District Court of Appeal explained its understanding of the earlier case: "[W]e do not read *Jacklyn F.* as holding that evidence that a parent has failed to communicate with his or her child for a year or has failed to provide any support for the child during that time can never be circumstantial evidence that the parent left the child and did so with the intent to abandon the child. Otherwise, it would be nearly impossible to prove that a parent who does not communicate with or support his or her child for a year has done what *Jacklyn F.* characterized as the 'physical act' of leaving the child for the statutory period." (*Marriage of Jill & Victor D*., *supra*, 185 Cal.App.4th at p. 505.)

We agree with *Marriage of Jill & Victor D.* Otherwise, one could never establish that a parent who is initially separated from his child because of incarceration has "left" the child despite years without any contact, support, or effort to communicate. (See also *Allison C.*, *supra*, 164 Cal.App.4th at pp. 1011-1012 [rejecting father's argument that, because restraining order and incarceration were involuntary, he did not voluntarily allow mother to assume custody].) Accordingly, we conclude that father's failure to communicate with Angelina for over five years while he was in prison was properly considered evidence that he left her within the meaning of section 7822.

Father next argues that there was no substantial evidence that he intended to abandon Angelina. We disagree. Section 7822 provides that "failure to provide support[] or failure to communicate is presumptive evidence of the intent to abandon." (§ 7822, subd. (b).) If a parent has "made only token efforts to support or communicate with the child, the court may declare the child abandoned .…" (*Ibid*.)

In this case, father did not dispute that Angelina had no contact with him since 2007, and she received no communication from him until his mother delivered some gifts and money to Angelina's maternal uncle's house in May 2013. Father's failure to communicate with Angelina for almost six years was presumptive evidence of intent to abandon.

We recognize that, when a parent is in prison, writing letters may be the only way the parent can communicate with his child. (*In re T.M.R.* (1974) 41 Cal.App.3d 694, 698 ["Since [the mother] was incarcerated during the period when she wrote to her children twice a month, it is obvious that she was utilizing the only means of communication available to her."].) Here, however, the evidence showed that Angelina received no letters from her father.

We also recognize that a parent may make the effort to write to his child, but the letters or other communication may not reach the child because of circumstances outside the parent's control. (*Jacklyn F.*, *supra*, 114 Cal.App.4th at p. 752 [mother sent letters to

her child's therapist; letters were given to guardian who did not show them to child].) Father asserts that his testimony that he wrote many letters to Angelina was "uncontradicted," but we observe that he contradicted himself. He testified that he first sent "a few letters" to his mother to give to Angelina in 2010, but he later testified that he sent his mother letters for Angelina at least once a month from 2007 until 2010.[3] His mother, Eva, testified that she was in Mexico from 2008 until 2011, casting doubt on father's claim that he sent letters to her with the expectation that she would deliver the letters to his daughter in California. Eva testified that father asked her to buy Angelina a gift at Christmas, but she did not confirm his testimony that he wrote to Angelina every month. In addition, as we have already noted, father was also able to have gifts delivered to Angelina's uncle's house a few weeks before the trial, a fact which appears to contradict his claim that he had no way of getting his letters to Angelina.

The trial court found that father failed to make a good faith effort to communicate with Angelina, suggesting that it did not believe his testimony about the many letters he wrote to Angelina and the efforts he made to have them delivered. Father's argument that his testimony was "uncontradicted" implies the trial court was somehow *required* to accept his testimony as true, but that obviously is not so. (E.g., *Marriage of Jill & Victor D.*, *supra*, 185 Cal.App.4th at p. 506 ["Here, the trial court was not required to believe father's testimony regarding his intent and, in light of the other evidence, father's testimony did not overcome the presumption of abandonment."].) Since credibility determinations are the province of the trial court (*Allison C.*, *supra*, 164 Cal.App.4th at

_____

[3]Father was first called as a witness by Patricia's attorney. She asked whether he sent anything to Angelina between June 15, 2007 and 2012, and father responded, "I sent a few letters to my mom to give to my daughter." Asked when he did this, he responded, "It was a couple years ago. It was like 2010." He explained, "That was the first—yeah, it was the first that I got a chance to send some stuff home for my daughter." Later, after a lunch break, father's attorney called him as a witness. When questioned by his own attorney, father testified that he wrote to his daughter "[a]ll the time" and sent packages of letters for her to Eva "[a]t least once a month" from 2007 until 2010.

p. 1015, fn. 9), and it was undisputed that Angelina did not receive any communication from father for almost six years, there was sufficient evidence to support the trial court's finding that father did not make a good faith effort to communicate with Angelina thereby raising the presumption of intent to abandon.

## ***DISPOSITION***

The trial court order is affirmed.