Filed 12/14/21  Adoption of L.W. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| Adoption of L.W. et al., Minors. | C093937 |
| S.W., | |
| Plaintiff and Respondent, | (Super. Ct. No. STA-FL-ADOP-2019-0004815) |
| v. | |
| A.W., | |
| Defendant and Appellant. | |

Appellant A.W., the biological mother of two minors, appeals from the family court's orders terminating her parental rights to both minors pursuant to petitions filed by the minors' stepmother, respondent S.W.

1

Mother argues the family court's finding that she abandoned the minors within the meaning of Family Code section 7822 is not supported by substantial evidence and is otherwise erroneous for several related reasons.[1] Disagreeing, we affirm the orders (judgments after court trial) of the family court terminating mother's parental rights as to both minors.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 6, 2019, S.W. filed petitions to adopt the minors as well as petitions to declare them free from mother's parental custody pursuant to section 7822. In support of the latter petitions, S.W. alleged that mother had not had any substantial visitation or communication with the minors for approximately two years. Mother was served and an investigator was appointed to prepare a report pursuant to section 9001. Mother appeared at the initial hearing on October 18, 2019, and objected to the petitions to terminate her parental rights.

On September 30, 2019, the county investigator concluded the adoption of the minors by S.W. would be in the minors' best interest. After a number of delays and conversations regarding settlement, the matter proceeded to trial on February 24, 2021.

The undisputed evidence presented at the trial and other portions of the record shows that mother and father G.W. married in 2001 and mother subsequently birthed two girls. In May of 2011, when the minors were two and seven years old, mother and father separated. Mother and father then shared custody of the minors. During the school year, father had physical custody of the minors on alternating weekends, and during the summer he had custody every other week.

In December 2011, father began dating S.W. (whom he married in late 2013). Around this time, father began to have concerns about the minors when they were in

---

[1] Further undesignated statutory references are to the Family Code.

2

mother's care. They frequently missed school, and the older child (who was diagnosed with high-functioning autism) talked about suicide and was aggressive with everyone except father and S.W. As a result of his concerns, and at mother's suggestion, father petitioned the court for sole physical custody of the minors.

Records of court proceedings submitted by S.W. as evidence at the hearing established that in June 2017, mother and father both attended mediation prior to the family court hearing on father's petition, but "after reviewing the mediator's recommendation, [mother] stated she would like to exercise her 5th Amendment right and once told this was not a criminal matter, she stated, 'it was about to be if she did not leave' and walked out on her own free will." Mother thus did not participate in the hearing; at its conclusion, the court awarded father sole legal and physical custody of the minors. At that time, the court restricted mother's visits to "a therapeutic setting with a licensed mental health clinician" occurring "no more than one time per week" and "for no more than one hour." The "therapeutic setting" was to be "specifically designed to alleviate distress evident in the minors, to facilitate and promote communication and a healthy relationship between the minors and the parent, and to improve the quality of parenting skills." Father testified that phone calls were at his discretion, as mother "always made threatening phone calls" and left "inappropriate messages" for the minors, some of a sexual nature and others "at random hours of the night."

S.W. testified that mother did not visit the minors for approximately four months after the visitation order was entered. S.W. and father both testified that mother's participation in the therapeutic visitation was "sporadic" once it began, explaining that sometimes she would attend three visits in a row, then once in a month, then not at all. Father "anticipated" she would miss visits, and she would contact him mere minutes before the visits were scheduled to let him know. When mother did participate in the visits, the minors left feeling "stressed out" and feeling "neglected." Father testified that he had "never missed a visit" and that mother would call his phone to "yell[]" at him

3

rather than to talk to the minors. He added that he had not received letters or phone messages from mother to the minors. S.W. also testified that mother had her phone number and had called it in the past, but not since May 2019, and that father had never blocked mother's calls.

Father testified that in 2017 on a date he could not remember, mother came to father's home and left a mixed bag of clothes apparently designed for girls, boys, and men on his front porch. There was no note with the bag and it smelled of cigarette smoke, which he associated with mother. Father characterized the bag as "trash"; he testified that this was the only time mother gave anything to the minors after the visitation order was entered in 2017. He specifically denied that mother had ever left gifts at the house for the minors or otherwise given them gifts.

After May 2019, mother stopped calling the minors and stopped contacting father to check on them. Father had blocked mother from his social media when they separated but his phone number, e-mail, and address had not changed. Mother had changed her phone number so many times that father no longer knew it.

On August 27, 2019, the family court heard father's petition to suspend mother's visitation with the minors; mother did not attend the hearing. The court suspended mother's visits pending further order of the court.

At the time of trial, the minors were 16 and 12 years old, respectively. In the time they had been in father's custody, they showed great improvement academically and socially. Both were in weekly counseling, and the older girl (who continued to participate in school under an IEP) was thriving with the consistent schedule established in father's custody.

The minors' therapist testified that she had diagnosed both minors with posttraumatic stress disorder, stemming from early childhood trauma and neglect while living with mother. As a result, the minors suffered from nightmares, flashbacks, and nervousness. After an objection to her testimony by mother's counsel, a stipulation was

4

reached wherein her testimony was limited to include only that information set forth above and her observations that both father and S.W. were involved in the minors' treatment and that the therapist had never met mother.

Mother's aunt testified that mother had a history of mental health issues, including suicidal ideation. She added that mother had a history of abusing drugs and alcohol, resulting in at least one stay in a residential treatment facility. She confirmed that mother had changed her residence often and that father and S.W. had remained at the same phone numbers for many years (father since "way before" 2015); the aunt had never had trouble contacting them monthly.

Mother was called to testify by her counsel; in relevant part, she acknowledged that in May 2017 she had "suggested that the children remain with" father and the resulting supervised visitation order was "intact for two years." She then volunteered that she "was only able to exercise it before [she] ran out of money and energy and ability to visit [her] children for about 13 months, 14 months." She agreed that she had visited once more and for the last time in May 2019; after that, father successfully petitioned the family court to suspend visitation, according to mother due to her mental health issues, although she also testified that the facilitator had retired and there was no new facilitator.

Mother claimed she attended "most" of the visits, only missing a few visits if she was sick or had to work overtime. She testified she would give father "about two days" notice, contacting him on his cell phone, if she had to miss a visit, but that she missed only "five total" visits. She then said: "[M]aybe like seven" and told S.W.'s counsel to "do the math" as counsel had "more schooling than" mother. She testified that about once a month, she would make the 90 minute drive to participate in the visits but father would not bring the minors. She claimed that on at least five to six occasions she had delivered items such as letters, gifts, and cards to the minors, leaving them on father's doorstep. She adjusted her testimony on cross-examination to claim she sent letters "every week" to the minors at father's house. She testified that as recently as

5

January 2021 she had dropped off gifts for the minors at father's house, including clothing, jewelry, makeup, and pillows, that were wrapped and bagged. She had left a note, but her "hired bodyguard" told her that father had taken the bags from the porch "straight to the dumpsters next to the house and threw them away." Mother also claimed that prior to retirement the visitation facilitator had been lying to the court and she believed the replacement facilitator would do the same.

Mother testified that she had called the minors every night and sometimes in the morning prior to suspension of visits; she usually left messages. Even those times she was able to connect with the minors, she claimed father interfered with the calls so they never lasted more than a minute or two. After the court suspended visitation, there was no phone contact. She did leave comments for the older child on YouTube, but she was not certain the child ever responded. She testified that she had tried to contact father after May 2019, but could not find a phone number for him despite many efforts.

She testified that she paid child support through a payee out of her social security check from 2017 onward, although at the (February 2021) trial she claimed to have had the payee to help her only for "about two and a half years."

During the initial part of father's testimony, mother interrupted multiple times, claiming "false allegation", calling father a "[l]ying sack of shit," and calling his responses to certain questions "All fucking lies," while opining that he "fucking failed" and "doesn't stay at home with my kids." After multiple admonishments by the court, mother stopped her comments.

The family court took the matter under submission after hearing from these five witnesses and hearing argument from counsel. On March 3, 2021, the court issued a written ruling granting the petitions to terminate mother's parental rights as to both minors. After summarizing the testimony presented at trial, the court found mother "was not a credible witness and was therefore not believable." The court added that mother had interrupted the proceedings and "at times used obscenities." After explaining the law

6

regarding the necessary findings, the court noted that "[w]hile [mother] testified that she did not intend to abandon her daughters, her actions tell a completely different story."

"Based on the testimony from all of the other witnesses," the court found by clear and convincing evidence that, through her conduct, mother had demonstrated her intent to abandon the minors, finding that mother had left the minors with father for one year without communication. Although the court did find that mother had paid some child support, it noted that mother had made only "token efforts" to communicate with the minors outside the one-year period, and concluded it was in the minors' best interests to terminate mother's parental rights and allow S.W.'s petitions to adopt the minors to proceed without mother's consent.

Mother timely appealed from the judgment after court trial. After multiple delays in preparation of the record, the case was fully briefed on October 20, 2021.

## DISCUSSION

Mother's primary contention on appeal is that insufficient evidence supports the family court's findings that she intended to abandon the minors within the meaning of section 7822, subdivision (a)(3). As we next explain, we disagree.

A proceeding under the Family Code to free a child from the custody and control of a parent may be brought when "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).) Proof of an "intent to abandon for the statutory period" suffices; intent to permanently abandon is not required. (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 886.)

The failure to communicate with a child is presumptive evidence of an intent to abandon. (§ 7822, subd. (b).) To overcome the statutory presumption, the parent must make more than token efforts to support or communicate with the child. (*Ibid.*) In determining a parent's intent to abandon, the court may take into consideration the

7

frequency of a parent's efforts to communicate with the child, the genuineness of the effort under all the circumstances, and the quality of the communication that occurs. (*In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1212.)

We apply the substantial evidence standard of review to the trial court's findings under section 7822. (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 503 (*Marriage of Jill*).) We do not decide credibility of witnesses, resolve conflicts in the evidence, or determine the weight of the evidence; we determine only whether substantial evidence supports the court's findings. (*Ibid.*) " 'The questions of abandonment and of intent . . . , including the issue of whether the statutory presumption has been overcome satisfactorily, are questions of fact for the resolution of the trial court.' " (*Id.* at p. 506.) " 'The appellant has the burden of showing the finding or order is not supported by substantial evidence.' " (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1011.)

We are mindful of the requirement that the relevant findings must be supported by clear and convincing evidence (§ Z7821) and adjust our standard of review accordingly. (*Guardianship of O.B.* (2020) 9 Cal.5th 989, 1005.)

"In determining the threshold issue of whether a parent has 'left' . . . her child, the focus of the law is 'on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent.' [Citations.] [¶] Thus, this court has held that a parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order [citation]; *however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child.*" (*Marriage of Jill*, *supra*, 185 Cal.App.4th at p. 504, second italics added.) We emphasize the preceding language because here there is evidence that mother "left" the minors within the meaning of section 7822 by voluntary inaction.

There is no dispute that the minors were removed from mother's custody by a judicial decree in 2017 and had remained in father's custody and care since that time; the weight of the evidence offered by S.W. at the February 2021 trial showed that although

8

mother was permitted weekly supervised visitation with the minors from June 2017 through August 2019, she attended only sporadically. The evidence established that she skipped the first four months of visits after the June 2017 order entirely, then attended off and on until what was by her own estimation a little over a year into the two-year duration of the order ("about 13 months, 14 months"), when she stopped participating at all except for a single (final) visit in May 2019.

Notably, even when mother did attend the therapeutic visits she was not participating in a meaningful way. The uncontroverted evidence at trial showed the visits were not achieving their stated purpose of improving the minors' mental health and their relationship with mother. The only evidence that mother made any effort to communicate with the minors in any parental way outside of these visits was provided by mother herself, whom the trial court expressly found not credible. The only credible evidence of communication was of calls at inappropriate hours of the night making inappropriate and sometimes sexual references to father in the minors' earshot. Thus, the weight of the evidence clearly and convincingly establishes that, since June 2017, mother's efforts to communicate with the minors were infrequent, disingenuous, and lacking any actual concern for or interest in the minors' welfare. Such "token efforts" are insufficient to overcome the presumption mother intended to leave the minors with father. (See *In re B.J.B.*, *supra*, 185 Cal.App.3d at p. 1212 ["When the evidence permits the conclusion of only token efforts to communicate with the child, 'Unless the presumption of abandonment raised by [that] fact has been overcome as a matter of law, the findings and order of the trial court . . . must be sustained' "]; § 7822, subd. (b).)

Mother argues the family court wrongly relied on her demeanor to find a lack of credibility, and her demeanor was affected by her mental health issues. But aside from the physical proximity of the credibility finding to the observation regarding outbursts in the written order, there is no evidence that the two were related. Further, there was no evidence presented that supports her argument that her outbursts were the result of mental

9

health issues.  Neither any expert witness nor mother nor anyone else testified about any impact of mother's mental health issues on her ability to control her outbursts.  Although mother adds that her "credibility does not impact the question of whether [] [she] met her burden of proof to establish abandonment"; because mother's testimony was the *only* evidence that she lacked the requisite intent and was called into question by other, circumstantial evidence, her testimony (and the credibility thereof) was key to the issue of intent. The family court did not believe her testimony; thus, it decided her intent adversely to her testimony and in line with the testimony that the court found credible. This is well within the discretion of a trial court, and our review for substantial evidence requires that we consider the evidence in the light most favorable to the verdict.  We do not review the trial court's credibility determinations.  (*Marriage of Jill, supra,* 185 Cal.App.4th at p. 503.)  Mother did not overcome the presumption of her intent to abandon the minors with her scattered and inconsistent, and at times frankly fantastical, testimony, which we have described in detail above and need not set forth again here.

Mother contends in the alternative that even if there is sufficient evidence to support the court's finding that she left the minors with father with the requisite intent, there is insufficient evidence she did so for the period of time required under the statute. We disagree.

The petitions were filed in September 2019, more than two years after father was awarded sole custody in June 2017.  As we have detailed *ante*, during that two-year period, mother made only token efforts to communicate with the minors and made no efforts to change the custody or visitation orders.  By her own admission, she visited only for a little over a year after the entry of the June 2017 order.  She did not participate in the August 2019 hearing where her visitation was suspended.  Substantial evidence

10

supports the trial court's finding that mother left the minors for at least one year with the intent to abandon them as required by section 7822, subdivision (a)(3).[2]

## DISPOSITION

The judgments (orders of the family court) are affirmed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Raye, P. J.

_____/s/_____
Hoch, J.

---

[2] Although mother also argues that "[w]ithout the prerequisite abandonment finding" the best interest of the minors is irrelevant, because we hold the abandonment finding was supported by substantial evidence, we need not and do not address this argument.