Filed 3/9/15  In re Wyatt M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# **COPY**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| In re WYATT M., a Minor. | C076580 |
| ALEXA M., | (Super. Ct. No. CVAD130019) |
| Petitioner and Respondent, | |
| v. | |
| JENNIFER R., | |
| Objector and Appellant. | |

Jennifer R. (mother), the biological mother of Wyatt M., a minor, appeals from a judgment terminating her parental rights and declaring the minor free from her parental control.  (Fam. Code, § 7822 et seq.; unless stated otherwise, statutory references that follow are to the Family Code.)  Mother contends the judgment must be reversed

1

because, in her view, the evidence was insufficient to support the trial court's finding she abandoned the minor within the meaning of section 7822. We affirm the judgment.

FACTS AND PROCEEDINGS

In 2004, mother broke her back. She was prescribed various pain medications following back surgery. She eventually became addicted to those prescription medications and occasionally used methamphetamine as well.

In 2006, mother briefly dated Michael M. (father). Their relationship, though short-lived, resulted in the birth of the minor in February 2007. At some point prior to the minor's birth, mother tested positive for methamphetamine, codeine, and prescription drugs. When the minor was born, she again tested positive for prescription drugs. Father did not learn he was the minor's biological father until 2008. By that time, he was in a relationship with Alexa M., the petitioner and the respondent in this appeal, who later became his wife.

In March 2008, Placer County Child Protective Services (CPS) removed the minor from mother's custody due to her criminal history and drug and alcohol abuse. Shortly thereafter, father obtained sole legal and physical custody of the minor, who from that point on lived with father and Alexa. Mother and father participated in mediation through Placer County family court services, and the court ordered weekly supervised visits which took place at the maternal grandparents' house in Lincoln or father's apartment in Rocklin. The maternal grandparents had ongoing contact with the minor at least once a week.

Mother continued to struggle with her drug addiction. One week after the minor was removed from her custody, she was arrested and charged with driving under the influence of methamphetamine and possession of methamphetamine. She participated in several drug recovery programs in late-2008 and early-2009.

2

Mother was arrested in 2010 for second degree burglary after she admitted stealing prescriptions from a doctor's office and attempting to write and fill them. While involved in those criminal proceedings, she filed a motion in Placer County seeking visitation with the minor. She and father continued to participate in mediation through family court services and, sometime in late 2010, entered into a stipulated agreement whereby mother was allowed weekly supervised visits at Parenting Time in Roseville until December 14, 2010, when, "[a]t the completion of [her] criminal court proceedings," mother had the opportunity to "petition the court to have her parenting time evaluated." The agreement also provided the maternal grandparents with weekly visitation and "occasional overnights" with the minor.

Mother attended Parenting Time several times and spoke with the minor on the telephone. However, visitation was stopped by the court mediator in December 2010 after mother was again arrested for second degree burglary, a charge for which she was later convicted and remained on probation as of the 2014 hearing on Alexa's petition.

During the first half of 2011, mother lived in Auburn and Napa. In May 2011, she gave birth to her second son, H., who was diagnosed with an immuno-deficiency disease. For the next 14 months (through July 2012), H. was quarantined at UCSF Children's Hospital in San Francisco where he received two bone marrow transplants. There were no visits between mother and the minor during that 14-month period.

On June 10, 2013, mother filed a request for order modifying child custody and visitation. She and father were again referred to mediation, and supervised visitation was ordered through Placer County.

On August 13, 2013, Alexa filed a petition in Sutter County to terminate parental rights of mother and for a stepparent adoption. The court referred the matter to Sutter County Social Services for investigation and preparation of a report.

We note that the report of the social worker was filed on December 6, 2013. Although the report was not admitted into evidence, the court referred to its contents,

without objection, in cross-examining mother during the evidentiary hearing, and mother and mother's counsel referred to the report on redirect. Mother's opening brief on appeal refers to the contents of the report in detail.

Mother's request for dismissal of the petition on jurisdictional grounds in light of the pending Placer County case was denied.

On March 28, 2014, the trial court conducted an evidentiary hearing. Mother, father, and Alexa were the only witnesses. They testified in relevant part as follows:

*Mother's Testimony*

Mother testified that when she was first in recovery in 2008 and 2009, she called the minor "[a]ll the time." When she called father, he either did not respond or called her names and acted inappropriately. Mother stated visitation was based solely on father's availability. While she was in recovery, the maternal grandparents brought the minor to see her for a day, a visit mother claimed had been approved by father.

In late 2010, mother spoke with the minor by telephone. When she did, she called herself "Mommy" and father would tell the minor, "Wyatt, come here. Your mom is on the phone." Mother claimed she attended "[c]loser to ten visits [with the minor] or maybe seven or eight visits . . . I know it was more than five," during which she was referred to as "Mommy." She also recalled sending the minor "[a]t least one [card] a week" and that she signed the cards "Mommy." She mailed the cards to the maternal grandparents hoping they would give the cards to the minor. Mother testified that, prior to filing her 2010 motion for visitation, she attempted to resolve visitation issues with father informally, but when she tried to contact him by telephone his phone was turned off and she was unable to contact him.

According to mother, she saw the minor twice prior to H.'s hospital stay when the maternal grandparents brought the minor up to Auburn to visit her at a homeless shelter. She initially testified that, during the 14-month period H. was quarantined at UCSF, she

4

"never left" the hospital; however, she later conceded she could and did leave the hospital because it was determined she was "making some poor lifestyle choices at that time" and a "sitter" was brought in to be with H. Nonetheless, she claimed she was at the hospital "six days of the week" and left only "occasionally when [H.'s] dad came for a break."

During H.'s stay in the hospital, she tried to contact the minor by calling the father's telephone at least once a week and sending cards and letters for the minor to the paternal grandparents' house. She claimed she was told to stop sending those items because the minor "doesn't get them anyway," so she mailed the cards to the maternal grandparents' home because she believed they had visits with the minor and could give the cards to him.

Once H. was released from the hospital, mother went to live with H.'s father in Napa for a year (through June 2013). She testified that, during that time period, she tried to contact the minor by calling father's cell phone or, when his phone was turned off, calling the paternal grandparents' landline. She rarely spoke with father because he would either not answer the phone or would answer and say, "You need to speak with my attorney." Father told her he was unwilling to allow any visitation without a court order. She left Napa in October or November 2013 and moved in with the maternal grandparents in Lincoln.

Pursuant to the order for supervised visitation following her June 10, 2013, request to modify visitation and custody, she attended five or six visits, three in October 2013, one in November 2013, one in December 2013, and one final visit in early 2014. She claimed one visit was cancelled because she was late and several more visits were cancelled by father and Alexa. She further claimed that, at two separate visits, the minor told her "he was scared because his mom [Alexa] had told him to be afraid of me because I may take him. I may take him away and keep him from his brothers." Although she was not permitted to exchange gifts with the minor, they made arts and crafts together during visits.

5

Mother testified her source of income was Social Security and workers' compensation. She applied in 2012 for the minor to receive her Social Security benefits. She claimed she tried "several times" to offer father financial support for the minor but was denied. When she contacted father to tell him there was $29 per month available for the minor's care, father said, "he wanted nothing from [her], and he would not take anything from [her]." Nonetheless, she deposited some of the money into a savings account, a portion of which she spent on clothes, school supplies, and presents for the minor. She gave those items to the maternal grandmother to give to father and Alexa.

Mother stated she is drug tested regularly and has "never given a negative test" since being placed on probation for her 2011 conviction. However, she admitted her other son H. was removed from her custody during that period and, because she made "little or no progress" in court-ordered services in that matter, custody of H. was eventually awarded to H.'s father. She also conceded that, although she and H.'s father never split up and the two lived together, there was a physical altercation while H. was present in September 2013 and the matter was again referred to CPS and was still pending as of October 24, 2013.

*Father's Testimony*

Father disputed a number of mother's claims. He testified that, in 2010, mother made sporadic efforts to contact him on his cell phone to set up a time to see the minor, but father told her she "would have to go through the courts to do so."

Supervised visitation at Parenting Time was stopped by court order in 2010. From that point on until after mother filed her petition to reinstate visitation in June 2013, there were no visits and mother only called "once or twice."

In 2013, father obtained a restraining order against the maternal grandfather, who had made "threats against my life [and] my two youngest sons." Shortly thereafter, father

6

obtained a restraining order against the maternal grandmother because she had been visiting the minor's school without his knowledge.

Shortly after receiving notice of mediation regarding mother's request for order modifying child custody and visitation, father and Alexa filed their petition for termination of parental rights and for a stepparent adoption. Although supervised visitation was ordered by the court, two visits were cancelled by the mother. Since October 2013, mother has participated in some supervised visits with the minor.

The minor is registered at school with a hyphenated last name that includes father's last name and mother's last name. However, father instructed the school and the teachers to refer to the minor by using only the father's last name.

The minor sees Alexa as "Mom," and mother as a "special friend," a term first introduced by mother and the mediator. When talking in front of the minor, father and Alexa have always referred to mother as "friend," not "mother." Father stated they have done this so as not to "confuse him [the minor]" and denied doing so to insulate the minor from mother, something he claimed mother "seemed to be doing . . . on her own."

*Alexa's Testimony*

Alexa also disputed mother's claims. She testified that, between 2008 and 2014, she saw mother no more than approximately 20 times, less than half of which did not involve a court proceeding. Visitation stopped in late 2008 due to mother's drug use, her refusal to drug test, and her criminal convictions. Thereafter, Alexa did not hear from mother again until 2010 when they met in court "to establish visitation to modify the order." Mother never called the minor, never offered to send him money, and never sent him gifts; she sent just one Easter card in 2012.

After mother's petition to reinstate visitation was granted in 2010, the court ordered five supervised visits at Parenting Time in Roseville, only three of which actually occurred (in November 2010). Visitation stopped in December 2010 pursuant to court

7

order, after which the parties were to go back to mediation to discuss further visitation. Alexa and father were instructed by their attorney that mother would have to contact the attorney or petition the court for further visitation. After mother gave birth to H. in May 2011, there were no more visits scheduled and Alexa did not hear from mother again until June 2013, when mother filed her request for order modifying custody and visitation.

Alexa testified that for nearly five years after the minor was placed with father, the maternal grandparents had ongoing contact with the minor at least once a week and always knew how to reach the father. Alexa and father discussed with the maternal grandparents that mother was not allowed to see the minor while he was in the grandparents' care. Although court-ordered grandparent visitation also ended in 2010, father and Alexa maintained an amicable relationship with the maternal grandparents and facilitated continued visitation on an informal basis until mid-2013, when father obtained a restraining order against each of the maternal grandparents.

*Trial Court's Order*

In its written findings and order after the evidentiary hearing, the trial court found in part as follows: Mother's testimony that she was unable to visit the minor due to H.'s hospitalization from 2011 through 2012 was not credible and was rebutted by the testimony of father and Alexa; mother acknowledged she did not see the minor during the year H. was hospitalized; although mother testified she had been "clean" since September 2012, she waited until June 2013 to file her request for order modifying custody and visitation; and, although mother was granted supervised visitation with the minor in October 2013, there "is no credible evidence presented . . . that [mother] exercised more than 3 visits with [the minor] since that visitation order was made."

The court further found that, "[b]ased on the credibility of the witnesses, the Court can find no reasonable explanation or justification to mitigate the fact that [mother] has had virtually no meaningful or court ordered contact with [the minor] since he was

8

removed by Placer County [CPS] and placed with [father] in 2008, nearly six years ago. The Court finds by clear and convincing evidence that [mother's] efforts at a relationship with [the minor] since 2008 have been token and unsubstantial at best."

The court found, by clear and convincing evidence, that mother failed to pay for the care, support, and education of the minor for "significantly more than one year" and failed to have more than "token communications" with the him pursuant to section 8604, subdivisions (b) and (c), and that mother abandoned the minor pursuant to section 7822, subdivision (a)(3). The court further found Alexa met her burden to terminate parental rights pursuant to sections 7822 and 8604, and to declare the minor free from parental control pursuant to sections 7823 and 7824, and ordered that mother's parental rights over the minor terminated and the minor freed from mother's parental control.

Mother filed a timely notice of appeal.

### DISCUSSION

Mother contends there is insufficient evidence to support the trial court's findings she "left" the minor in father's care and custody and intended to abandon the child within the meaning of section 7822, subdivision (a)(3).

A proceeding to free a child from the custody and control of a parent may be brought when the child has been left by one parent "in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).)

In reviewing the trial court's findings under section 7822, we apply the substantial evidence standard of review. *(In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 503 *(Marriage of Jill*).) We do not pass on the credibility of witnesses, resolve conflicts in the evidence, or determine the weight of the evidence, but simply determine whether there is substantial evidence, believed by the trial court, that supports the court's

findings. *(Ibid.)* " 'The questions of abandonment and of intent . . ., including the issue of whether the statutory presumption has been overcome satisfactorily, are questions of fact for the resolution of the trial court.' " *(Id.* at p. 506.) " 'The appellant has the burden of showing the finding or order is not supported by substantial evidence.' [Citation.]" (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1011.)

"In determining the threshold issue of whether a parent has 'left' . . . her child, the focus of the law is 'on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent.' [Citations.] [¶] Thus, this court has held that a parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order [citation]; however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child [citation]." (*Marriage of Jill, supra*, 185 Cal.App.4th at pp. 504-505.)

Mother contends that because the threshold "leaving" requirement of section 7822 can only be established where the parent has voluntarily left the child, not where the child is taken against the parent's wishes or by coercion (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68), the requirement was not met here because the minor was removed from her custody by judicial decree, first through dependency proceedings in 2008, and then again when visitation was terminated on December 14, 2010. Mother claims she made "numerous attempts" to visit and contact the minor but was thwarted by father "at every turn." Acknowledging there was little or no visitation between December 2010 and September 2013, she explains she "spent the last half of 2011 and the first half of 2012 mostly confined to the hospital" with H., and claims she nonetheless attempted to contact the minor by telephone and saw him "a couple of times" when the maternal grandparents brought him to see her. Relying on this court's opinion in *In re Jacklyn F.* (2003) 114 Cal.App.4th 747 (*Jacklyn F.*), she argues the "judicial taking" was therefore never converted to a "leaving" by her nonaction. (*Id.* at p. 755.)

In *Jacklyn F.*, the mother left her seven-year-old child with the paternal grandparents for three days without informing them where she was or when she would return.  (*Jacklyn F., supra*, 114 Cal.App.4th at p. 749.)  The lower court granted the grandparents' guardianship petition and thereafter the mother had no contact with the child for over a year.  (*Id.* at pp. 749-751.)  A panel of this court reversed the order terminating parental rights.  Concluding section 7822 "contemplates that abandonment is established only when there is a physical act—leaving the child for the prescribed period of time—combined with an intent to abandon, which may be presumed from a lack of communication or support" (*id.* at p. 754), this court found there was no evidence the minor was "left" by her mother and thus no abandonment.  (*Id.* at pp. 749, 757.)

We specifically discussed *Jacklyn F.* and distinguished that opinion in *Marriage of Jill, supra*, 185 Cal.App.4th 491, where we addressed the issue as follows:

"Numerous appellate decisions have long agreed that the leaving-with-intent-to-abandon-the-child requirement of section 7822 can be established by evidence of a parent's voluntary inaction after an order granting primary care and custody to the other parent.  [Citations.]

"Simply stated, 'nonaction of the parent after a judicial decree removing the child may convert a [judicial] "taking" into a "leaving" [of a child by the parent].'  [Citations.]

"In a factual context far different from that in the case now before us, a panel of this court expressed its disagreement with the view that 'evidence of a [parent's] failure to communicate [with] or support [the parent's child] for the statutory period of [section 7822] can, in itself, satisfy the separate statutory requirement that the child be "left" for a prescribed period of time.'  (*Jacklyn F., supra*, 114 Cal.App.4th at p. 755.)  Concluding 'the statute contemplates that abandonment is established only when there is a physical act—leaving the child for the prescribed period of time—combined with an intent to abandon, which may be presumed from a lack of communication or support' (*id*. at p.

11

754), *Jacklyn F.* found there was no evidence of such leaving in that case . . . . (*Id.* at pp. 749-750.)

"*Jacklyn F.* noted, however, it did 'not discount the possibility that, under different circumstances, it might be proper to conclude that a parent has "left" a child within the meaning of section 7822 despite court intervention,' but found that the matter on review was 'not such a case.' (*Jacklyn F., supra*, 114 Cal.App.4th at p. 756.) That was so because, '[o]nce the guardianship was granted, [the mother] was no longer legally entitled to custody of the minor without further court order' and the mother's 'conduct following the granting of the guardianship—which included sending "stacks" of letters to the minor but failing to visit her—did not constitute "parental nonaction" amounting to a leaving.' (*Ibid.*)

"Thus, we do not read *Jacklyn F.* as holding that evidence that a parent has failed to communicate with his or her child for a year or has failed to provide any support for the child during that time can never be circumstantial evidence that the parent left the child and did so with the intent to abandon the child. Otherwise, it would be nearly impossible to prove that a parent who does not communicate with or support his or her child for a year has done what *Jacklyn F.* characterized as the 'physical act' of leaving the child for the statutory period." (*Marriage of Jill, supra*, 185 Cal.App.4th at pp. 504-505.)

Here, there is no dispute that the minor was removed from mother's custody by judicial decree in 2008 and has since remained in the custody and care of father. However, the evidence shows that, despite such court intervention, mother "left" the minor within the meaning of section 7822 by her own nonaction. At the time of removal in 2008, mother was entitled by court order to weekly supervised visitation with the minor. She participated in some visits until she was arrested for driving under the influence of methamphetamine. For the next year, she participated in drug recovery programs during which there was at best a single visit facilitated by the maternal

12

grandparents who brought the minor to see her. And while mother claims she called the minor "[a]ll the time" during her recovery, Alexa and father disputed that claim. According to Alexa, there was no communication from mother to schedule visitation from the time of her arrest in late 2008 until 2010, when she filed her motion to reinstate visitation.

In late 2010, the parties entered into a stipulated agreement that provided for weekly supervised visits and telephone calls with the minor until December 14, 2010, after which date mother could petition the court to reevaluate her parenting time. Even so, mother only visited with the minor three times before visitation was terminated prior to the December 14, 2010, deadline due to her second burglary arrest. For the next three years, and particularly during the year prior to the filing of Alexa's petition on August 13, 2013, the critical period for purposes of abandonment under section 7822, subdivisions (a)(3) and (b), there was little communication and no visitation between mother and the minor. Although mother attested to two visits facilitated by the maternal grandparents between December 14, 2010, and May 15, 2011, weekly telephone calls to father's cell phone, and cards and letters regularly sent to the minor via the grandparents, the trial court made an explicit determination it did not find her testimony credible. Nor did the court find credible mother's explanation for why she did not once visit the minor during the 14 months H. was hospitalized. We do not review the fact finder's credibility determinations. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. James* (1977) 19 Cal.3d 99, 107 [" 'The power to judge credibility of witnesses, resolve conflicts in testimony, [and] weigh evidence . . . is vested in the trial court. On appeal all presumptions favor proper exercise of that power' "].)

By mother's own testimony, there were no visits either during or after H.'s stay in the hospital. And although father informed her there would be no visitation without a court order, a position that appears to be consistent with the parties' late December 2010, stipulated agreement, she did not file her request to modify visitation until June 10, 2013.

13

Thereafter, despite yet another order for supervised visitation, she attended only a handful of visits. There is substantial evidence to support mother's nonaction following removal of the minor from her custody, and thus to establish that the "judicial taking" was converted to a "leaving" for purposes of section 7822.

Mother contends the evidence shows she rebutted the statutory presumption of an intent to abandon the minor. She asserts that she offered financial support to the minor despite the absence of a demand therefore, and that her attempts to communicate with the minor were thwarted by father and Alexa. Acknowledging the trial court did not find parental alienation, she emphasizes that father's resistance to her communication with the minor and the fact that he and Alexa deliberately kept her true identity from the minor and identified her only as a "friend" demonstrate the obstacles she faced in trying to maintain a relationship with the minor. We are not persuaded.

" 'The questions of abandonment and of intent . . ., including the issue of whether the statutory presumption has been overcome satisfactorily, are questions of fact for the resolution of the trial court.' [Citation.] 'A parent's "failure to provide support[] or failure to communicate" with the child for a period of one year or more "is presumptive evidence of the intent to abandon," and "[i]f the parent [has] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent . . . ." (§ 7822, subd. (b).)' [Citation.] [¶] 'When the evidence permits the conclusion of only token efforts to communicate with the child,' the ' "findings and order of the trial court under subdivision (a) [(1)] must be sustained," ' unless ' "the presumption of abandonment raised by [token efforts to communicate] has been overcome as a matter of law . . . ." [Citation.]' [Citation.]" (*Marriage of Jill, supra*, 185 Cal.App.4th at p. 506.)

Mother had numerous opportunities, as previously discussed, to maintain a relationship with the minor through regular, consistent visitation and contact. Despite her ongoing criminal proceedings and persistent drug-related issues, the court repeatedly

14

ordered that she be allowed supervised visitation and telephone contact. Her participation, though sprinkled with token telephone calls and an Easter card, was virtually nonexistent during the two to three years prior to the filing of Alexa's petition. Similarly, she made only token efforts to provide financial support to the minor by applying for Social Security benefits sometime after the birth of H. and depositing $29 a month into an account, "some of" which she claimed to have used to purchase items for the minor. In light of the other evidence, mother's testimony did not overcome the presumption of abandonment.

Finally, having concluded the evidence is sufficient to support the finding of abandonment as discussed above, we need not reach mother's claim that the trial court improperly relied on the best interests of the minor in concluding her parental rights should be terminated.

## DISPOSITION

The judgment is affirmed.


        HULL        , Acting P. J.


We concur:


        MAURO        , J.


        DUARTE        , J.

15