Filed 7/11/23  In re M.L.  CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re M.L., a Minor. | |
| | D081334 |
| S.L. et al., | |
| Plaintiffs and Respondents, | (Super. Ct. No. 21AD000707N) |
| v. | |
| J.H., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Kelly C. Mok, Judge.  Affirmed.

Paul A. Swiller, for Plaintiffs and Respondents, S.L. and M.L.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant, J.H.

Mad.L. (Mother) and J.H. (Father) are parents to 14-year-old M.L. M.L.'s stepfather, S.L. (Stepfather), petitioned to terminate Father's parental rights on the basis that Father left M.L. in Mother's care for a period of one year without provision or support, or without communication, with the intent

to abandon M.L. (Fam. Code,[1] § 7822.) After conducting an evidentiary hearing, the trial court granted the petition. Father appeals and contends: (1) Stepfather lacked standing to seek the termination of Father's parental rights under section 7822, subdivision (a)(3); and (2) substantial evidence did not support the order terminating Father's parental rights, nor was it in M.L.'s best interests to do so. We conclude Stepfather was not without standing to pursue the termination of Father's parental rights and that substantial evidence supports the trial court's order granting the petition. We therefore affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

*Family Background*

Mother and Father were never married and had an "on-again off-again relationship." During their relationship, M.L. was born in 2008. A month after M.L.'s birth, Mother called the police when Father engaged in a physical altercation with her neighbor. Mother alleged that during the incident, Father grabbed M.L. from her arms and punched Mother in the nose. Father pleaded guilty to child endangerment, and following his criminal conviction, custody orders were issued that awarded Mother physical custody of M.L. and allowed Father unsupervised visitation.

In 2011, the custody orders were modified to award Mother sole legal and physical custody after Father attempted suicide before a visit with M.L. The visitation component of the orders authorized Father to have up to eight hours of supervised visitation per week. Although Father's initial visitation during this period was supervised by a family member, Mother later allowed him to have unsupervised visitation in violation of the court's order for approximately six months. She allowed Father to have unsupervised

---

[1] Undesignated statutory references are to the Family Code.

2

visitation because she observed him make positive changes in his life that made her "really hopeful." However, during this period of unsupervised visitation, M.L. made comments that caused Mother to believe Father was using drugs and sleeping while caring for M.L.

Mother expressed her concern to Father about his suspected drug use, and following this discussion, he moved to Australia for approximately seven months. During his absence, Father had video "Facetime" calls with M.L. approximately once a week. When he returned from Australia, Mother informed him that she would be enforcing the court order that required his visitation with M.L. to be supervised.

To facilitate the supervised visits, Father obtained an independent supervisor and had approximately eight visits with M.L. Following the eighth visit, the visitation monitor stopped working with Father due to nonpayment. Father made attempts to find another suitable supervised visitation monitor, but he did not recommence visitation with M.L. His final visit with M.L. was on June 30, 2014. Father moved to Utah in July 2017 and did not have any further contact with Mother or M.L. following his move.

In the meantime, Mother and Stepfather met in 2013 and were married in 2014. Stepfather was introduced to M.L. in 2013 and they developed a "father/daughter" relationship. Mother and Stepfather have their own two children, who live together with M.L. as "one big happy family." At M.L.'s request, her last name was legally changed to Stepfather's last name. According to Mother, M.L. has repeatedly asked to be adopted by Stepfather.

*The Petition and Trial*

On October 19, 2021, Stepfather filed a petition seeking the termination of Father's parental rights in order to facilitate his petition for M.L.'s adoption. Stepfather alleged that Father left M.L. in Mother's custody

3

for a period of one year without providing for M.L.'s support, or without communication, with the intent to abandon her. Mother filed a declaration in support of Stepfather's petition to terminate Father's parental rights.

The San Diego County Health and Human Services Agency (Agency) completed an investigation and report related to Stepfather's petition.[2] The Agency spoke with M.L. and she expressed that she understood the meaning of adoption and wanted to be adopted by Stepfather. She referred to her Stepfather as "daddy" or "papa," and the Agency opined that M.L. and Stepfather shared a "wonderful relationship." M.L. indicated that she did not intend to have contact with Father in the future.

The Agency concluded that Father last contacted M.L. in the spring of 2016 and that he had not provided financial support since July 2020. Consequently, the Agency concluded that Father's "lack of contact and support for a period exceeding one year provides presumptive evidence of his intent to abandon his daughter." The Agency recommended that the court grant the petition and declare M.L. free from Father's custody and control.

The trial court conducted an evidentiary hearing related to the petition on October 20, 2022. The court heard testimony from Mother and Father and received several exhibits into evidence, including family photos, the supervised visitation monitor's report documenting Father and M.L.'s visits,

---

[2] Upon the filing of a petition to free a child from the custody and control of a parent, the probation officer, qualified court investigator or department administering the public social services program "shall immediately investigate the circumstances of the child and the circumstances which are alleged . . . ." (§ 7850.) The investigator "shall render to the court a written report of the investigation with a recommendation of the proper disposition to be made in the proceeding in the best interest of the child." (§ 7851, subd. (a).) The court "shall receive the report in evidence and shall read and consider its contents in rendering the court's judgment." (§ 7851, subd. (d).)

a document listing the history of Father's child support payments, and the Agency's report recommending that the court terminate Father's parental rights. We have reviewed and considered these exhibits in deciding this appeal.

Mother testified that Stepfather first met M.L. in 2013. She observed their relationship develop throughout the "different stages" of M.L.'s life. Stepfather participated in M.L.'s interests in various ways, like playing guitar with her and purchasing a pitching machine to help her practice softball. Mother described their relationship as "very sweet" and "like father/daughter, but also they have a friendship." According to Mother, M.L. was sad that Stepfather's name was not on her birth certificate like her siblings, and she expressed a desire to be adopted by him. Mother supported Stepfather's petition to terminate Father's parental rights to facilitate M.L.'s adoption.

Mother also described an incident in 2016 in which Father encountered Stepfather and M.L. at a farmer's market. Although Father had not had any visitation with M.L. in two years, he approached M.L. and picked her up. Father told M.L. that Mother and Stepfather were preventing him from visiting with her. After this incident, M.L. told Mother that she was scared and uncomfortable by the interaction because she was fearful Father would hurt Stepfather or her younger brother.

Mother testified that she had not received any communication from Father following his move to Utah in 2017. She stated that her phone number and email address remained the same and that she had remained at the same physical address until three months prior to the evidentiary hearing. Father did not send any gifts or cards to M.L. during this time, nor did Mother receive any payments relating to M.L.'s care aside from the child

support payments that were garnished from Father's paychecks. Mother did not receive any child support payments for a one-year period, from August 2020 to September 2021.

Father testified that he did not act with the intent to abandon M.L. However, he acknowledged that he had not had any visitation with her since 2014, aside from the farmer's market incident in 2016, even though the custody and visitation orders allowed him up to eight hours of visitation per week. Father disputed Mother's testimony relating to the farmer's market incident, testifying that M.L. smiled and approached him and that she was not frightened by their interaction.

Father explained that he moved to Australia in 2014 to manage his family's affairs following the death of his sister. He intended to return from Australia prior to M.L.'s birthday in December of that same year, but he decided to remain for a longer time period after Mother informed him she would be enforcing the court order requiring supervised visitation. Father acknowledged that he did not successfully obtain a supervised visitation monitor after his return from Australia, nor did he return to court to request a change in the visitation order to allow for unsupervised visitation. He testified that he did not return to court to request such a change because he hoped Mother would "snap out of it" and stop requiring the supervision.

Father explained that he moved to Utah in 2017 for a job opportunity that would assist him in paying child support for M.L. He asserted that he discontinued child support payments in 2020 because of the COVID-19 pandemic, unemployment, and health-related issues. However, he admitted that aside from a period between February 2020 and May 2020, he was employed. According to Father, he did not attempt to contact M.L. after he moved to Utah because he did not know where she lived and whether he was

6

allowed to contact her. Consistent with Mother's testimony, he testified that he had not had any contact with Mother since 2017.

Following the presentation of evidence, the trial court found, by clear and convincing evidence, that Father intended to abandon M.L and that the termination of his parental rights was in M.L.'s best interests. In rendering its findings, the court commented that there was "no doubt that [Father] loves [M.L.]," and that the evidence demonstrated they had a good relationship from 2011 to 2014. However, the court found that the last contact between Father and M.L. was in 2014, aside from the incident in which Father approached M.L. at the farmer's market in 2016. The court stated that Father's "surprise contact" at the farmer's market in 2016 was not in M.L.'s best interests considering he had not had contact with her in two years. By contrast, Stepfather and M.L. had bonded "as a child and father" and M.L. was desirous of the petition being granted.

Although the trial court acknowledged Father's attempts to find an appropriate visitation supervisor, it found there was no evidence that Father "went back to court to try and change the orders or that he made any real attempts to satisfy all of the court's concerns in order to get his supervised visits changed to unsupervised visits." The court noted that although Mother had the same phone number and email address since 2017, Father had made no attempts to communicate with M.L. The court further found that Father's last child support payment was in July 2020 and that he did not provide financial support for M.L. until September 2021—a period of over a year. Although Father testified that he experienced financial challenges in 2020, the court noted that he started a new job in May 2020 and yet he did not make child support payments.

Consequently, the trial court granted the petition, finding by clear and convincing evidence that Father failed to communicate with and provide financial support for M.L. for a period of over one year, and that he did so with the intent to abandon her for the purposes of section 7822. The trial court further found that it was in M.L.'s best interests to terminate Father's parental rights.

## DISCUSSION

Father contends Stepfather lacked standing to petition for the termination of his parental rights under section 7822, subdivision (a)(3), because only the "other parent" has the statutory authority to file such a petition. Consequently, Father argues the trial court did not have jurisdiction to adjudicate the petition because of Stepfather's lack of standing. Father alternatively argues that, assuming the trial court did have jurisdiction, the order granting the petition was not supported by substantial evidence and was not in M.L.'s best interests. We conclude Stepfather had standing to file the petition to terminate Father's parental rights as an "interested party" pursuant to section 7841 and that the trial court's order was supported by substantial evidence.

*Stepfather had Standing to Seek the Termination of Father's Parental Rights as an Interested Party[3]*

A proceeding may be brought to free a child from the custody and control of a parent under section 7822 if, as relevant here, "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).) "Actions to free minor children from the custody and control of either or both parents are governed by sections 7800 through 7895.5. [Citation.] The persons or entities authorized to file petitions in such actions are set forth in two sections of the statute, sections 7840 and 7841 . . . ." (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1433.) Section 7841 provides that an "interested person may file a petition under this part for an order or judgment declaring a child free from the custody and control of either or both parents." An interested person is defined as one who "has filed, or intends to file within a period of 6 months, an adoption petition under Sections 8714, 8802, or 9000 . . . ." (§ 7841, subd. (b).)

Inexplicably, Father fails to cite to section 7841 even though it expressly defines who may file a petition under section 7822 and is extensively addressed in the respondent's brief. Without discussing the relevant statute, Father contends that the language of section 7822,

---

[3] Stepfather argues that Father forfeited his argument relating to standing by failing to object at trial. Although the law does not support Father's standing argument, the issue he raises involves a pure question of law and statutory interpretation and is therefore not subject to forfeiture. (See *In re P.C.* (2006) 137 Cal.App.4th 279, 287 ["A question of law is not subject to the doctrine of forfeiture."].)

subdivision (a)(3), allows only for the "other parent" to file a petition for the termination of parental rights. Contrary to Father's argument, section 7841 plainly and expressly allows a stepparent to file a petition under section 7822 if they have concurrently filed a petition for adoption or intend to do so within six months. (§ 7841, subd. (b).) By contrast, section 7822, subdivision (a)(3), simply defines the triggering events upon which a petition for the termination of parental rights may be based when one parent has abandoned a child with "the other parent," and it does not define who may bring forth such a petition. (See § 7822.)

Father does not cite to any precedent supporting his position, but instead argues that this matter involves an issue of first impression. However, established case law has repeatedly affirmed orders granting petitions filed by stepparents pursuant to section 7822. (See *Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1007 (*Allison C.*) [affirming an order granting a stepparent's petition to terminate a father's parental rights under section 7822 that was filed "as a precursor [to the stepparent's] adoption of [the child]]; *In re Amy A.* (2005) 132 Cal.App.4th 63 (*Amy A.*) [affirming an order granting a petition filed by a stepparent to terminate a father's parental rights pursuant to section 7822 so the stepparent could pursue the adoption of the child].) While a stepparent's standing to petition for the termination of parental rights was not directly raised as an issue in these cases, we conclude that the repeated affirmance of orders granting stepparents' petitions under section 7822 reflects what statutory authority plainly allows—that stepparents may file such petitions when the conditions set forth in section 7841 are met. (See *San Joaquin & Kings River Canal & Irrigation Co. v. County of Stanislaus* (1908) 155 Cal. 21, 28 ["it does not follow that the *dictum* of a court is always and at all times to be discarded. A

correct principle of law may be announced in a given case, although it may not be necessary to there apply it."].)

Accordingly, applying the language of section 7841 to the circumstances of this case, Stepfather clearly had standing to file a petition to terminate Father's parental rights. Stepfather filed a petition for M.L.'s adoption concurrently with his section 7822 petition and therefore plainly meets the definition of an "interested party" under section 7841. Interested parties may file petitions pursuant to section 7822 and therefore Stepfather was not without standing to pursue the termination of Father's parental rights to facilitate the adoption process.

## II.

### *Substantial Evidence Supports the Order Terminating Father's Parental Rights*

Section 7800 et. seq. allows for a child to be declared free from a parent's custody and control to facilitate the child's adoption. The purpose of these proceedings is to "serve the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." (§ 7800.) These statutory provisions must be "liberally construed to serve and protect the interests and welfare of the child." (§ 7801.)

Section 7822 provides grounds for terminating parental rights when a parent has voluntarily abandoned a child. A "section 7822 proceeding to terminate parental rights is appropriate 'where three main elements are met: (1) the child must have been left with another; (2) without provision for support or without communication from the parent for the statutory period; and (3) with the intent on the part of the parent to abandon the child.' " (*In re Aubrey T.* (2020) 48 Cal.App.5th 316, 326 (*Aubrey T.*).) A parent's "failure to provide support, or failure to communicate is presumptive evidence of the

11

intent to abandon. If the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents." (§ 7822, subd. (b).)

The trial court's findings in a proceeding brought under section 7822 must be based on a clear and convincing evidence. (*Aubrey T., supra*, 48 Cal.App.5th at p. 326; § 7821.) "[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [reviewing] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) We review the record in the light most favorable to the trial court's order and we do not evaluate "the credibility of witnesses, resolve conflicts in the evidence or determine the weight of the evidence." (*In re E.M.* (2014) 228 Cal.App.4th 828, 839.) It is the appellant's burden to show that the evidence is insufficient to support the trial court's findings. (*Ibid.*)

Father argues there was only a single 12-month period in which he failed to communicate with and provide support for M.L., and that this evidence does not sufficiently establish his intent to abandon her under section 7822. In support of his argument, Father contends that he did not leave M.L., but rather that she was "taken" by the family court order that required Father's visitation to be supervised. He argues M.L. was further taken when Mother hindered Father's visitation by rejecting his proposed visitation monitors. We disagree with Father's characterization of the record and conclude substantial evidence supports the trial court's findings that Father left M.L. in Mother's care for longer than the one-year statutory period in section 7822, subdivision (a)(3).

"In determining the threshold issue of whether a parent has 'left'. . . [their] child, the focus of the law is 'on the voluntary nature of a parent's abandonment of the parental role rather than on *physical* desertion by the parent.' [Citations.] [¶] Thus . . . a parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order [citation]; however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child [citation]." (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 504–505 (*In re Marriage of Jill*).) "Simply stated, 'nonaction of the parent after a judicial decree removing the child may convert a [judicial] "taking" into a "leaving" [of a child by a parent].' " (*Id.* at p. 505.)

Here, Father's actions are similar to those of the father and appellant in *In re Marriage of Jill*, *supra*, 185 Cal.App.4th 491. In that case, the father had no contact with his children following a 2001 family court order that required the father to fulfill certain conditions in order to visit with the children. (*Id.* at pp. 498–500.) The mother successfully filed a petition to terminate father's parental rights in 2008, and on appeal the father argued there was insufficient evidence that he "left" his children within the meaning of section 7822 because he was deprived of custody by judicial decree. (*Id.* at p. 503.) The appellate court rejected his argument, identifying instances of the father's inaction since his last contact with the children: he stopped seeking contact with the children; he left them in the mother's care six months prior to the date the final custody and visitation orders were entered; he made no attempt to appeal the judgment and did not seek modification of the custody and visitation order for over three years; he made no effort to comply with the conditions that would have allowed him to have contact with

13

the children; he did not seek any type of parental relationship with the children; and he did not pay child support voluntarily. (*Id.* at p. 505.)

Similarly, here, Father acknowledged that the visitation orders allowed him to have up to eight hours of supervised visitation with M.L., but he did not fulfill the conditions that would have allowed him to have the visitation. Although the trial court recognized Father's efforts at obtaining an appropriate supervised visitation monitor, the court found that Father did not successfully obtain such a monitor, nor did he make any attempt to modify the supervised visitation order with the family court. And since at least 2017, Father did not make any attempt to communicate with M.L. through phone calls, emails, or letters, despite no court-ordered restrictions in his ability to do so. Although Father did make child support payments until 2020, these payments were garnished from his paychecks and not voluntarily made. Viewing this evidence in the light most favorable to the trial court's findings, as we must, we conclude substantial evidence supports the trial court's finding that Father "left" M.L. for the purposes of section 7822.

As to the remaining elements—whether Father failed to communicate with or provide support to M.L. for one year, with the intent to abandon—we similarly find that the trial court's findings are supported by substantial evidence. Abandonment and intent are questions of fact for the trial judge, and when supported by substantial evidence the trial judge's decision is binding upon the reviewing court. (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1011.) For the purposes of section 7822, "[t]he parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the intent to abandon the child during the statutory period." (*Amy A.*, *supra*, 132 Cal.App.4th at p. 68.)

14

Here, the trial court found that aside from the farmer's market incident in 2016, Father had no contact with M.L. since 2014 and had made no attempt to contact Mother or M.L. since 2017. Mother testified that her phone number and email address remained the same, and yet she received no communication from Father. Father did not send M.L. cards, gifts, or support, aside from the child support payments garnished from his wages. Father admitted that he had not attempted to contact Mother since he moved to Utah in 2017. Thus, Father failed to communicate with M.L. for far longer than the one-year statutory period reflected in section 7822, subdivision (a)(3).

As to his failure to provide financial support, Father argues, and the trial court acknowledged, that his financial circumstances were affected in 2020 by the COVID-19 pandemic. However, Father testified that he resumed work in May 2020 and yet did not make child support payments. Father concedes that during the 12-month period, from August 2020 through August 2021, he did not provide child support payments for M.L. or have any form of communication with her.

Accordingly, although we reject Father's contention that his lack of communication and support for M.L. was limited to the one-year period between August 2020 and September 2021 (considering that he had not communicated with M.L. or Mother since at least 2017), this one-year period meets the statutory requirement under section 7822, subdivision (a)(3). (§ 7822, subd. (a) (3) [a proceeding may be brought when "[o]ne parent has left the child in the care and custody of the other parent for *a period of one year* without any provision for the child's support, or without communication from the parent . . . ."] (italics added).) Along with Father's failure to communicate for over a year, the trial court's factual finding that Father

15

acted with the intent to abandon is also supported by substantial evidence, considering the successive years of Father's absence, his failure to communicate with Mother or M.L., and his lack of any attempt to modify the visitation order that he contends prohibited his ability to visit with M.L. Accordingly, we conclude substantial evidence supports the trial court's finding that Father failed to provide support or communicate with M.L. for the relevant statutory period, with the intent to abandon.

Finally, the trial court's finding that the termination of Father's parental rights was in M.L.'s best interests was supported by the record. After the trial court concluded that Father left M.L. without communication or support for over a year, the trial court commented on the strength of the bond between Stepfather and M.L. The court noted that M.L. was desirous of the petition being granted and that she had previously asked to have her last name changed to Stepfather's name. Considering that the termination of Father's parental rights facilitates M.L.'s adoption by Stepfather, as well as the substantial evidence that Father abandoned M.L. for the purposes of section 7822, we conclude substantial evidence supports the trial court's finding that its order was in M.L.'s best interests.

## DISPOSITION

The order terminating Father's parental rights pursuant to section 7822 is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

CASTILLO, J.

17